## Bracken *against* Miller.

In order to visit a principal with constructive notice of a fact known to his agent, it is necessary that such knowledge should have been gained by the agent in the course of the same transaction.

If land be conveyed for the purpose that the grantee shall sell the same and reimburse himself for certain moneys paid for the grantor, who afterwards dies and makes the grantee his executor, who receives his personal estate, there is no legal presumption, in the absence of positive proof, that there was any other fund applied to the payment of the debt of the grantee than the one specially created for the purpose.

The promissory notes of a testator found among the papers of his executor many years after his death afford a reasonable presumption that they were paid by the executor, without any other proof of the fact, especially when no claim had ever since been made by the creditor.

A purchaser of land charged with a trust, of which he had no notice, takes it discharged of such trust; and a purchaser from him will also take it discharged of the trust, although he had notice of it prior to the first purchase.

ERROR to the District Court of *Allegheny* county.

Thomas G. Campbell, executor of Mary Bracken, against Alexander Miller. And the same plaintiff against Walter H. Lowry and Walter Forward, executors of Marian Pride, deceased.

These causes involved the same facts and questions of law. The charge of the court, which contains a clear statement of the facts of the case, and the questions of law raised, was the only subject of the assignment of error.

GRIER, President.—This suit was brought to April term 1840, by Mary Bracken, late widow of Thomas Bracken, deceased, (who was also an executrix and devisee under his will), against Alexander Miller. It is an action of *assumpsit* for money had and received. Alexander Miller is the guardian of Ann Pride, a minor, and has received $17,835.31 from the executors of Marian Pride, as part of a legacy bequeathed to his ward by her aunt, Marian Pride.

[Bracken v. Miller.]

The plaintiff has given in evidence a deed from Thomas Bracken and wife to David Pride, dated the 23d of March 1816, for two lots in Pittsburgh, and one out-lot of 12 or 13 acres, for the consideration of $16,200. This consideration is admitted to have been paid in cash by David Pride. They have given in evidence also, a paper signed by David Pride, dated the 25th of March 1816, two days after the execution of the deed, which, so far as material, is as follows : " Thomas Bracken, of the borough of Pittsburgh, and Mary his wife, by indenture, dated the 23d day of March 1816, for the consideration of $16,200, did grant and convey to me a certain lot or piece of ground, &c. &c., (as described in the deed). Be it known that I, David Pride, did and have made the purchase of said property merely for the purpose of paying the notes of the said Bracken to sundry banks to the amount of about $14,000. Also about $700 to the executor of Alexander Spear for the completing of the title to lot No. 215; as also $1173 to James Bracken for the completing the title to the out-lot, as per schedule annexed hereto; to enable me to make which payments with the purchase money described in said deed, I have borrowed $15,000 at the office of discount and deposit at Pittsburgh; and being desirous to promote the settlement of said Thomas Bracken's business generally, I agree that after I may dispose of the said lots in such manner as I may deem most advantageous, and having refunded to myself the said $15,000, as well as the debt due to James Bracken, with all expenses and costs, to which I have or may be liable to pay, as well as moneys for which I have or may have to pay to or for said Thomas Bracken or his estate in any manner or way whatever. The residue of moneys that may accrue in my possession from the sales of any or all of the lots, (after having all my advances and payments so refunded), I agree to apply to the payment of other debts of said Bracken in such manner as he, the said Bracken, his executors, administrators or assigns, may approve. That is to say, in the first place to the payment of his accommodation notes in banks, and afterwards to any other debts."

For the purpose of getting the history of this transaction, and in order that we might understand how the parties came to enter into it, we received the testimony of Mr John Thaw, the mutual friend of both parties, who wrote the papers, and was acquainted with the whole transaction; and you must observe, carefully, that although the court, after objection made by defendants, permitted the witness to go on and state in his own way his whole recollection of the matter, it was not with the intention that the court or you would give any different effect to these papers on account of any understanding or recollection of the witness. Contracts and bargains are put in writing for the purpose of avoiding the uncertainty of parol testimony and human memory. It would be absurd, therefore, that the better evidence should afterwards be

[Bracken v. Miller.]

controlled by the weaker, unless in cases of clear mistake or palpable fraud.

The chief assistance which we receive from the testimony of Mr. Thaw, is in enabling us more fully to understand the schedule annexed, and referred to in the agreement. It appears that Thomas Bracken, at the time of this transaction, was on his death-bed, not expecting to live many days; that he was much involved in debt; that there were some of his debts, which he wished particularly to be paid in preference to others, to wit, about $21,000 which he had obtained out of the various banks. His notes were under protest, his friends had endorsed for him, and if some arrangement was not made by Bracken before his death, his endorsers would be subjected to immediate suit, to great trouble and probably ruin. David Pride was his son-in-law, a gentleman in good circumstances and in good credit. In order to raise money to lift these protested notes, Pride borrowed $15,000 out of the Branch Bank of Pennsylvania, in this place, on his own credit; agreed to purchase this property for the sum of $16,200, and to pay the money raised for Bracken in such way as to first relieve the endorsers: two-thirds of the debt to each bank was paid down in cash, and notes on long time (6 and 9 months) were given by Bracken for the balance; in order, I presume, that his executors might have time to raise the means to pay them, and thus save his endorsers. Soon after this arrangement was made, Bracken died, leaving Pride and his widow as his executors. Pride settled up his estate, and received assets to the amount of some 10 or $12,000. Bracken's debts turned out to far exceed his assets, perhaps $20,000. It appeared also that after an audit to apportion the assets, the estate paid but 32 per cent.

Now it is not worth while to examine the discrepant testimony concerning the real value of this property in 1816, as it is apparent from the face of this paper that the parties considered it worth at least $16,200; and that David Pride expected that if he would make future advances, probably to pay all these bank debts, the property might be worth the whole—else why covenant to give Bracken's estate the benefit of the rise which was expected might take place? Whether Pride could have sold this property for a higher price, or even had a higher offer, we have no evidence. It is probable that both he and Bracken may have entertained extravagant ideas as to the future value of this property, which it has taken 20 years to realize, and that few others could be found even at this time to enter into such a speculation. Suffice it to say, it is a well-known (and by many as well remembered) portion of the history of those times, that not long after this, times began to change. This property was levied upon by the sheriff on a judgment entered against Pride. The list of liens annexed to the inquisition show the amount of judgments against Pride to

[Bracken v. Miller.]

be fifty-odd thousand dollars. He was at this time, to use the expression of the witness, Mr Simpson, "utterly insolvent." The property now in question was sold by the sheriff, and a deed made to Marian Pride, the sister of David Pride, for the sum of $2220. Whether this, or the sum of $20,000, at which it was probably five or six years before, be nearest to its real value, it is useless to inquire. If the proverbial rule, that "the worth of anything is just so much as it will bring," holds good, it sold for what it was worth; at least we have no evidence it would have brought more, but, on the contrary, that other similar property in those days sold even for less. Though the judgment of those who calculated that this borough would one day grow to be a great city, and that this property would come to be of great value, has turned out to be correct, yet it is probable but few in those hard times were willing to risk their money on so distant a prospect of advantage.

Without at present intimating any opinion as to whether this property was bought in with the money of David Pride, or whether Marian Pride purchased with such notice of a trust as would make her liable to account as trustee, it may be proper to remark, that you may probably think under the circumstances of the case, there is little room for the charge made against David Pride of a fraudulent attempt to get rid of this trust by the scheme attributed to him. The prospect that this property would ever be sufficient to pay the large sum which David Pride had advanced on it, and leave anything for Bracken's creditors or heirs, was at that time highly improbable, if not visionary. Pride's interest in it was justly liable to be sold for his debts. In better times it paid $16,000, if not $20,000, of the debts of Bracken; at best it could not now be expected to sell for more than one-fourth that amount towards the payment of Pride's debts. And no man of sober judgment could likely be found who would give ten cents for Bracken's interest in the land, or chance of realizing anything out of it; so that one can hardly see any sufficient motive for any fraudulent attempt upon the interests of Bracken's estate.

Some five years after this sale to Marian Pride, the bank or its attorney seems to have entertained some suspicion that this purchase was in fact made with the money of David Pride, and levied on this property a second time as his property, and sold it. It was purchased by the bank for $770, and this title was afterwards bought in by Marian Pride, and some $200 or $300 paid to obtain it. Marian Pride died in May 1835, having first made her will, appointing Walter Lowry and Walter Forward her executors, with power to sell this property, and bequeathing the proceeds of it to her nephew and niece, children of David Pride. The executors have sold the property for somewhere about $40,000; of this sum, near $18,000 has been paid over to the

IV. — 14

[Bracken v. Miller.]

defendant, Alexander Miller, who is guardian of Ann Pride, surviving legatee of Marian Pride. Having thus given an outline of the history of this case, let us more particularly examine the points of law and questions of fact arising in the case, and which we are called on to decide.

The plaintiffs contend, that by the transaction between Bracken and Pride on the 23d and 25th of March 1816, Pride became the trustee of Bracken as to this land, and that any person purchasing the land with notice of the trust, took subject to it; and if even they should sell the property for more than the sum Pride paid on account of it, they would be bound to pay the overplus to the representatives of Bracken.

On the contrary, the defendants contend that even if this was a trust attached to the land, it descended to the heir, and the plaintiffs could not recover; but they contend that it is not a trust running with the land, but that the transaction was a sale to Pride for full value, and the paper relied on amounts only to a personal covenant, on which an action might lie against Pride. Pride could sell discharged of the trust to any person who might have full notice of all the facts, and he would not hold the land subject to that trust. That the sheriff is but the agent of the law to sell, and could give as good a title as Pride himself, even if the purchaser at sheriff's sale has this covenant in his hand at the time of the purchase. This point is reserved by the court, and for the purposes of the decision of this cause, at present we shall assume the law to be as contended for by plaintiff's counsel, in order that you may pass upon the facts in that view of the case.

The first question then for your consideration will be whether Marian Pride is a purchaser with such notice of this secret trust as to be affected by it and hold the land subject to it. The paper containing this alleged trust was never put on record, so that it lies upon the plaintiff to show that she had actual notice. Two different views of the facts regarding this sheriff's sale have been taken, which it will be necessary to notice separately. The plaintiff's counsel contended that the purchase made, though in the name of Marian Pride, was in fact made by David Pride with his own money. He argued first that Marian Pride was too poor to buy, having been only a schoolmistress, &c.; but it appears she had at least a house and lot, had probably not speculated, and was not in debt. If she had little, it is in evidence that David Pride was utterly insolvent, and probably worth $30,000 less than nothing. His expectations that this property might one day become valuable, and if his sister bought it, (as she had no children of her own), she would be most likely to give it to his children, might afford a reason why he should feel anxious that his sister should buy it, if she had saved a little money. But of this you will judge; if you find this to be the fact that David

[Bracken v. Miller.]

Pride was the real purchaser, merely using his sister's name, and paid for it out of his own money, then the question will arise, what was the effect of the sale to the bank? If Pride was the purchaser at his own sale, the property still remained his, and could be levied on and sold as his; as against Pride and his heirs this judgment could be levied on this land, although not revived in five years; and if the bank bought without any notice, (and there is no evidence of any), of this secret trust, their title would be good, and having a good title, could convey a good title even to one who had full notice of the trust; and it matters not whether the consideration in the deed was one dollar or one thousand, or whether the bank considered their title good or not. But if you should believe that Marian Pride bought with her own money, and was the real purchaser, have you any evidence that she had notice? I know of no evidence of any witness that she ever saw this paper or heard of it.

The Supreme Court, in the case of *Scott* v. *Gallagher*, (14 *Serg. & Rawle* 333), say, "Courts of justice view secret agreements with a jealous and scrutinizing eye. The owner of the legal title should have direct, express, and positive notice, otherwise he takes the property discharged of the trust which existed between the original parties." In *Peebles* v. *Reading*, (8 *Serg. & Rawle* 495), it is said, "Notice of the trust must be made out by the clear proof of actual notice; it should not be mere report; the notice should be actual and circumstantial. In a case like this there can be no implied notice, for that is something different from actual." The mere probability that David Pride may have communicated the circumstance connected with his deed to Marian his sister, or that because she was his sister, and therefore you may guess that she knew, is not enough. This paper had been written seven years before; it was kept in Mr Thaw's desk, and only lately turned up when this land became valuable. In 1823, when the property would not fetch $5000, the claim of Bracken's heirs to what it was worth after paying $20,000, might well be considered, by one who knew of it, to be so utterly hopeless and worthless, as to be not worth mentioning. But it is contended that the knowledge of David Pride her agent, obtained seven years before, is sufficient notice to Marian Pride, who employed him to negotiate this purchase for her. But that is not the law. *Hood* v. *Fahnestock*, (8 *Watts* 490). "To visit the principal with constructive notice, it is necessary that the knowledge of the agent or attorney should be gained in the course of the same transaction."

If you find therefore that Marian Pride purchased without notice of this secret trust, your labour will end here, and your verdict should be for defendant. But in case you proceed further, it will be necessary for the court to notice some other points made.

[Bracken v. Miller.]

The defendant contends that this action will not lie against him who is guardian and has received but a portion of this money, and that less than the acknowledged amount which defendant has a right to retain:—that he cannot give an account for the executors, or settle an account of which he is wholly ignorant. That the action should have been account render against the executors Forward and Lowry who sold the estate. We shall reserve this point also, and instruct you for the purposes of this trial, that in case your opinion on the preceding points is in favour of plaintiffs, as you have a statement laid before you of the whole amount raised by the executors, you may settle the whole account, and if there be an overplus coming to plaintiff, that he may receive in this suit from the funds in defendant's hands.

In order to do this, you should examine first how much has been realized from this property. Of this we have no other evidence, than the statement made by the executor himself, who happens to be defendant's attorney in this case. It is stated by him as the neat amount, deducting all expenses except the charge of the executors:

| | |
|---|---:|
| Paid A. Miller, Guardian, | $17,835.31 |
| John Arthurs, | 8,136.54 |
| Ann Pride, since suit, | 950.00 |
| In hands of Lowry, | 9,500.00 |
| Bonds unpaid, | 1,200.00 |
| | $37,621.85 |

The next question is, should anything be added for the rents? A mortgagee in possession is chargeable with the rents, deducting taxes and repairs; but the defendants are not mortgagees. If this property had been conveyed to Pride merely in trust to sell, he should have been charged strictly; but under the peculiar covenant in this case, which is only to give the vendor the rise when sold above all the vendee's advancements, costs and expenses—(not a word said about rent)—I question if a chancellor would charge them: it will be for you to say; if charged, allowance should be made for taxes; possibly you might think the rents a fair equivalent for paying the taxes, making the sales, and collecting the money. The amount of the sale of the town lots, $825, should be added to the debtor side. On the other side, defendants claim the amount paid at the sale as appears by the deed, $16,200, and interest up till satisfied. Plaintiffs have objected to the whole of this being allowed, and say that 32 per cent. should be taken off, as received from Bracken's personal estate. There is no evidence of this, and Pride would have no right to such a charge, and therefore cannot be presumed to have got it allowed.

Next, as to the six notes given by Bracken at this time for the balance of his indebtedness to the banks, and which appear to have

[Bracken v. Miller.]

been lifted by Pride, as he has them, and they are not receipted like the others for 32 per cent. Whether Pride when he lifted them looked only to this property for security or not, is not in evidence; but as he might and could have got credit on his administration account for their *pro rata* payment, if you allow these notes, probably you will think proper to take off the 32 per cent. If these and other allowances which you might think proper to make on both sides throw a balance on the credit side, you will find for defendants; if on the other side, that amount for plaintiff, subject to the conditions of law previously stated. By a rough calculation I have made, allowing defendant the $16,200, and interest twenty years, also the notes lifted, deducting 32 per cent. and adding interest twenty years, the defendant's claim overruns the neat amount of sales, even if rents were added. If you so find, your verdict should be for defendants."

Errors assigned:

1. The court misled the jury in that part of the charge in which it is said, " But it is contended that the knowledge of David Pride her agent, obtained seven years before, is sufficient notice to Marian Pride, who employed him to negotiate this purchase for her." But that is not law. For, as it was David Pride's duty as trustee of Bracken to give notice of the trust, he must be taken to have had notice of the trust at the time he was acting as Marian Pride's agent.

2. The court erred in saying there was no evidence of part of the $16,200, advanced by Pride for Bracken at or about the time of the execution of the deed to her, having been paid out of Bracken's personal estate, since " Pride would have no right to such a charge, and therefore cannot be presumed to have got it allowed."

3. In directing the jury to allow Pride credit for the promissory notes of Bracken found among Pride's papers, without any evidence of his having paid them beyond the mere fact of their being in his possession.

4. In saying that if Marian Pride bought at the sheriff's sale in 1823 the property in question with the money of David Pride, the subsequent sale to the Bank of Pennsylvania and the conveyance by the bank to Marian Pride vested a title in her discharged of the trust.

*M'Candless* and *Findlay*, for plaintiff in error, argued that David Pride was a trustee of the land conveyed to him, and that the facts of the case showed clearly that Marian Pride had full knowledge of that fact, and entered into the scheme by which the heirs or creditors of Bracken were to be deprived of the surplus of the proceeds of the sale which the parties contemplated would remain after the payment of the debts mentioned in the schedule. He

was her agent in the purchase of the property at the sheriff's sale, and was therefore bound to give her notice of the trust, and the presumption of law is that he did so. 2 *Story's Eq.* 502, 517. If it clearly appears that she had full knowledge of all the facts and circumstances of the case, it is equitable and just that the parties in interest should be permitted to follow the fund into her hands. 3 *Watts* 442, 480.

*Metcalf* and *Lowry, contra,* contended that there was no trust with which the land was charged; but so far from it, that it was the object of the parties in making the conveyance that a good title should be vested in the grantee for the purpose of enabling him to sell and raise money to reimburse him the money mentioned in the agreement. It was but a personal obligation of David Pride, that he would appropriate the proceeds in a particular way; and even if Marian Pride had purchased with that paper in her hands, she would have taken the land discharged of any trust. But it is perfectly manifest that when Marian Pride purchased in 1823 as the property of David Pride, the property was not worth one-fourth of the money which he had actually paid for it. What equity then would there be in appropriating the accidental rise in the value of the property to the heirs of Bracken? The case in 8 *Watts* 480 clearly establishes the law, that the principal will only be affected by knowledge acquired by the agent in the course of the same transaction.

The opinion of the Court was delivered by

SERGEANT, J.—It is unnecessary, in delivering the opinion of the Court in the present case, to do more than notice the points assigned for error, as all the facts and circumstances relating to it are fully stated and well commented upon in the opinion brought up for our revision, and to repeat them would but load the case with details, either passed on by the jury, or now waived by the plaintiff in error.

1. The first error assigned is in the charge of the court, in refusing to accede to the plaintiff's proposition, that the knowledge of David Pride, the agent of Marian Pride, obtained seven years before her purchase, was sufficient notice to Marian Pride, who employed him to negotiate this purchase for her. In this, however, it is our opinion there was no error, but that the charge of the court was correct. Even supposing David Pride was but a trustee, and held the lands conveyed to him by Thomas Bracken in 1816 subject to certain trusts, expressed in the paper signed by David Pride, two days after the conveyance, yet the alleged purchase by Marian Pride was not made till the year 1823, and was a separate and distinct transaction from that of 1816, to which David Pride was a party; and brings the case we think clearly

[Bracken v. Miller.]

within the rule cited by the court below from *Hood* v. *Fahnestock*, (8 *Watts* 489), that to visit the principal with constructive notice, it is necessary that the knowledge of the agent or attorney should be gained in the same transaction. This is, at best, rather a dubious ground on which to conclude that the principal had notice —because, for various reasons he may not communicate his knowledge to his principal, although strictly it might be his duty to do so. But to a certain extent, it has been so considered, and where it occurs during the same transaction, where the knowledge of it is fresh and the memory recent, and the events transpiring are of importance to the interests of the principal, there is perhaps good reason for it. But it cannot be so inferred of an old and different transaction, of a knowledge deposited in a secret paper, one which the agent has long ago perhaps laid aside as obsolete, or which he may, as the plaintiff suggests, have an interest in suppressing all knowledge of, lest a development of it should defeat the object contemplated by him. There is a further difficulty in the way of the position assumed by the plaintiff, growing out of the evidence in the cause. I have looked over the paper-book carefully, and have not been able to find in any part of it proof that David Pride, or M'Donald, the attorney of the bank, was the agent of Marian Pride, except so far as it may be inferred from the declarations and acts of David Pride himself, and these are not evidence to show his agency. *Irvine* v. *Buckaloe*, (12 *Serg. & Rawle* 35.) Marian Pride does not appear to have had any interviews with M'Donald, or any communication or correspondence with him; nor is there any evidence that she authorized David Pride to make the declarations or take the course he did. For aught that appears she may have been wholly ignorant of all that David Pride said, or M'Donald, the attorney for the Bank of Pennsylvania, did in relation to the sale of these lots under the judgment and execution of the bank, and may have bid at the sheriff's sale and paid the purchase money and received the deed without any participation in their arrangements. It cannot therefore be fairly assumed that M'Donald was her agent. He seems undoubtedly, according to the evidence of several witnesses, to have conformed to the wishes of David Pride, but I see nothing to reach Marian Pride, beyond conjecture or probability, which must be disregarded in establishing the fact of notice against her.

2. The second error assigned is in the court's stating to the jury, that there was no evidence of part of the $16,200, advanced by Pride for Bracken, at or about the time of the execution of the deed to her, having been paid out of Bracken's personal estate, and Pride would have no right to such a charge, and therefore cannot be presumed to have got it allowed. I perceive nothing in the evidence to show that the position laid down by the court was inaccurate. By the terms of the declaration or covenant given

[Bracken v. Miller.]

by David Pride to Thomas Bracken, two days after the deed, the sale of the lots was the source from which Pride was to be refunded the money he had raised and the debt of James Bracken, with all expenses and costs, as well as other moneys he might pay out— the residue to go to Thomas Bracken or his estate. Till Pride sold, certainly he must have looked to the land under the plain interpretation of this agreement; and the verbal testimony of Thaw, that it was intended he should have power to resort to the estate, is not evidence to contradict the express terms of the written contract, and to deprive it of one of its most essential features, that David Pride should realize his advances out of the sales of the land itself.

3. The third error is in directing the jury to allow Pride credit for the promissory notes of Bracken found among Pride's papers, without any evidence of his having paid them beyond the mere fact of their being in his possession. The case is of an executor who has been dead for sixteen years, and there are found among his papers promissory notes given by his testator to a third person and due some seven or eight years before, but without any receipt upon them or other evidence of payment, and without any claim during the interval on account by the creditor. I confess I should suppose it but a fair and rational presumption that he had paid them, at least till some doubt is cast upon it by the other side, especially where the objection is made by a third person, not a party to the notes, and no further interested than in the fact of payment. We know that it is the duty of one who demands payment of a promissory note to produce it; and that the maker is not ordinarily bound to pay the note unless it is produced and surrendered. The finding them, therefore, especially after a lapse of many years, in the undisturbed possession of the executor, would be *primâ facie* evidence that they had been surrendered after payment. It would be a forced idea to suppose the creditor so confident or so careless, as to give them to the executor merely as evidence of his claim, and then omit to take back either the money or the note. This is certainly not in the usual course of human affairs, and therefore not to be regarded as presumable under the circumstances.

4. The fourth and last error assigned is, in the court's saying that if Marian Pride bought, at the sheriff's sale in 1823, the property in question with the money of David Pride, the subsequent sale to the Bank of Pennsylvania, and the conveyance by the bank to Marian Pride, vested title in her discharged of the trust. Nothing however can be clearer than this proposition of the court. There is no pretence that the Bank of Pennsylvania, the purchaser of the lots in 1828 at sheriff's sale as the property of David Pride, had any notice actual or constructive of the alleged trust contained in the declaration executed by David Pride in 1816. The land

[Bracken v. Miller.]

then, if it was bought with David Pride's money and belonged to him, was discharged from the trust by this sale without notice to the purchaser, the Bank of Pennsylvania. Marian Pride, by her deed from them, held it in the same way, even if she had had notice—the rule being well settled, that if the first purchaser had no notice, a second purchaser from him holds the land discharged of a trust, even although such second purchaser had notice of it; *Harrison* v. *Forth*, (*Prec. Ch.* 51); *Brandlyn* v. *Ord*, (1 *Atk.* 571); *Sweet* v. *Southcote*, (2 *Bro. Rep.* 66); 2 *Fonbl. Eq.* 147. Marian Pride's representatives therefore are not responsible for the fulfilment of the trust, nor liable for account for the proceeds of lands derived from her by will or otherwise; but if there has been any breach of trust committed, it has been by David Pride, and his representatives are to be looked to. I say, if there has been a breach of trust, because I am by no means satisfied that the paper of the 25th of May 1816 ought to be considered as a trust impressed on the land, or anything more than a personal covenant for the application of the proceeds of sales—or that even on a settlement of accounts with the representatives of David Pride, anything would in equity be found due from those lands to the plaintiff. But this it is unnecessary to consider.

In conclusion, it seems to us that this last point rules the whole case, since we cannot read over the evidence without seeing that it presents the only plausible ground on which the plaintiff's claim could be put, and upon that the law is against him.

Judgment affirmed.