MELMS and others, Appellants, vs. PABST BREWING COMPANY and others, Respondents.

*February 4 — May 1, 1896.*

*Estates of decedents: Sale of lands: Executor interested in purchase: Void or voidable: Notice to subsequent purchasers of illegality in executors' sale: Attorney and client: Equity: Setting aside conveyances: Laches: Pleading.*

1. Under sec. 3914, R. S., providing that if an executor purchases directly or indirectly, or is interested in the purchase of, lands sold by him, the sale "shall be *void*," such a sale is not absolutely void,

Melms and others vs. Pabst Brewing Co. and others.

but is voidable only, and the executors' deed to one who purchases in fact for the use and benefit of one of the executors passes the legal title, subject to be impeached only by persons interested in the estate.

2. The evidence in this case is *held* insufficient to show that grantees of the purchaser at an executors' sale had actual notice of the fact that his purchase was made, in violation of sec. 3914, R. S., for the use and benefit of one of the executors.

3. The good faith of such grantees cannot be impeached by evidence that facts showing the illegality of the executors' sale came to their knowledge after the conveyance to them and the rights of the parties had become fixed.

4. An attorney's knowledge acquired in a previous transaction is not to be imputed to subsequent clients, where it would be a breach of professional confidence to communicate it to them, or where his interest in or relation to the previous transaction was such as would induce him to withhold the information. Thus, where, in violation of sec. 3914, R. S., land sold by executors was purchased for the use and benefit of one of them, and the attorney who acted for the parties to such sale afterwards acted for both parties to a conveyance by the purchaser to other persons, his knowledge of the illegality of the executors' sale is not to be imputed to such other persons.

5. In an action by heirs at law to set aside an executors' deed and subsequent conveyances based thereon on the ground that, in violation of the statute, one of the executors, plaintiffs' mother, was the real purchaser at the executors' sale, though another person was named as grantee in their deed, it appeared, among other things, that the estate of the plaintiffs' testator was hopelessly insolvent, so that their rights as heirs were technical rather than substantial; that creditors were the persons really defrauded by the illegal sale, which resulted indirectly in a benefit to plaintiffs by securing to their mother, out of the estate, means to support and educate them; that, to plaintiffs' knowledge, the land had been conveyed to subsequent purchasers, who had held and improved it as their own for nearly twenty years before the action was brought, during which time it had greatly increased in value; that the action was not brought until more than four years after the youngest plaintiff had attained majority; that the material facts were all the time known to their mother and uncle, and were in no way concealed from them; and that, nearly ten years before the action was brought, an investigation as to plaintiffs' interest in the estate had resulted in the production of documents, which

were placed in the hands of their attorneys, sufficient to show the
real character of the executors' sale. *Held,* that plaintiffs were
guilty of laches which should preclude their obtaining relief.

6. In an action to set aside conveyances for fraud committed many
years before the commencement of the action, the plaintiff must
allege and prove the time when the fraud was discovered and
what the discovery was, so that the court may clearly see whether,
by the exercise of ordinary diligence, the discovery might not
have been made before.

APPEAL from a judgment of the circuit court for Milwau-
kee county : FRANK M. FISH, Judge. *Affirmed.*

The plaintiffs, the heirs at law of Charles T. ,Melms, de-
ceased, brought this action against *Leopold Melms* and *Marie
Melms,* their mother, surviving executor and executrix of
the will of the said deceased; *Frederick Pabst; Lisette Schan-
dein,* executrix of the will of Emil Schandein, deceased; and
the *Pabst Brewing Company,* — to set aside (1) a deed of
the Melms Brewery property, exclusive of the homestead,
in Milwaukee, of which the testator died seised, dated May
25, 1870, executed by *Leopold Melms* and William Melms,
as executors, and *Marie Melms,* as executrix, of said Charles
T. Melms, deceased, to Jacob Frey for a recited considera-
tion of $379.50, subject to the condition that the grantee
should pay off four certain mortgages thereon; (2) also, a
certain deed of the same premises from said Frey and *Marie
Melms* to said *Pabst* and Schandein, dated November 1, 1870,
for a recited consideration of $95,000, subject, in like man-
ner, to certain mortgages which the grantees were to pay;
(3) also, a certain sheriff's deed of said premises, executed
to said *Pabst* and Schandein, upon a certificate of foreclos-
ure sale thereof, founded on one of said mortgages, and dated
July 29, 1871; and (4) a subsequent deed of conveyance of
the said premises from *Pabst* and Schandein to the Phil. Best
Brewing Company, — under which said deeds the *Pabst
Brewing Company* claimed title to the premises in dispute, —
all upon the ground that said several deeds were fraudulent

and in violation of the rights of the plaintiffs as such heirs at law of Charles T. Melms, deceased. The defendants *Frederick Pabst* and the *Pabst Brewing Company* insisted upon the validity of said several conveyances, denied the fraud alleged, and insisted, among other things, that, as the action had not been commenced until October 30, 1890, the plaintiffs were barred of relief by reason of laches. The main facts are stated, for the most part, in the preceding case between the same parties in relation to the title to the homestead of the deceased, to which reference is here made. *Ante,* p. 140. Such additional facts and details essential to the merits are, in substance, as follows:

The license of sale, upon which the deed from the executors to Frey was founded, directed the premises to be sold, subject to four mortgages on the whole property, including the homestead, for the payment of $65,000, besides interest and costs, and the right of dower of the widow of said deceased. At the public sale by the executors, one of their attorneys acted as auctioneer, and the premises were struck off to the said Frey, a brother-in-law of *Marie Melms,* executrix, for the sum of $90,000, subject to said mortgages. It appears that this was done in the expectation that a corporation would be formed, and a large number of the creditors and others were to take stock, and moneys were to be advanced, so as to enable the terms of the sale to be carried out, and Frey was to be manager of the business. The attorney of creditors of the estate to the amount of $80,000 was present at the sale, and he was familiar with the scheme for forming and managing the corporation. This scheme failed, and Frey failed to make good his bid. The sale was not reported to the court, but instead thereof a sale as having been made for only $379.50, subject to the mortgages; and it was confirmed by the court. *Marie Melms,* the executrix and the mother of the plaintiffs, paid said sum of $379.50, and the executors' deed was made to Frey, but in

fact for her use and benefit. This proceeding, with report of sale and deed, was conducted and the papers prepared by the same attorney for the executors. The final account of the executors was filed and settled, pursuant to notice, and the residue in their hands was ordered distributed September 29, 1870. In this account they debited themselves with $379.50 for the property in dispute, which this account shows had been appraised at $110,000, exclusive of the homestead.

The subsequent sale by Frey and *Mrs. Melms* to *Pabst* and Schandein, November 1, 1870, was conducted mainly on their part by one of the executors, *Leopold Melms, Mrs. Melms* being present and assenting thereto. The homestead was included in the sale with the brewery property, with the dower right of *Mrs. Melms,* and all was subject to a mortgage of $30,000 to one Baker, trustee, which the purchasers were to pay; and they executed a mortgage for $40,000 of the purchase money to *Leopold Melms,* as trustee, to secure coupon bonds issued to him for the benefit of divers persons interested therein, and the remaining $25,000 was agreed to be paid by paying and extinguishing two certificates of sheriff's foreclosure sales on mortgages to that amount upon the whole property, and upon which deeds would be due in June or July of the following year. The vendors were to pay all due on said certificates over $25,000, which *Mrs. Melms* in fact paid. The other mortgage on the premises was to be paid off by the vendors exchanging for the same bonds secured by the $40,000 mortgage, or otherwise, as they might elect. This mortgage was afterwards paid by *Mrs. Melms* with and out of said bonds. Included in the sale of the real estate was the machinery, apparatus, tools, trucks, hooks, casks, and other personal property appertaining to the business of the brewery or malt house, and then on the premises. The conveyance made by Frey and *Mrs. Melms* to *Pabst* and Schandein was subject to incum-

brances, in substance, as specified in the agreement, which was carried out by the parties in all respects, except that, instead of redeeming the $15,000 certificate of sheriff's foreclosure sale, as they had agreed to do, *Pabst* and Schandein took an assignment of it from the holder February 21, 1871, and on July 29, 1871, obtained a sheriff's deed thereon, covering the property in question as well as the homestead. The purchasers, *Pabst* and Schandein, selected one of the attorneys who had acted for the executors in the administration of the estate, and who had acted in making the executors' sale and report, obtaining its confirmation, and in the preparation of the conveyance, under the license of the court, to Frey, to act for them as well in the purchase, preparation of agreement and deed, and examination of title, with the knowledge that he was the attorney for such executors, being assured by one of the latter that such attorney knew all about the business. Accordingly, he acted for both parties, preparing the agreement and other documents, and had the abstract of title produced, continued down until that date, and each party paid one half of his charges. It was claimed that, at the time *Pabst* and Schandein agreed to purchase, *Leopold Melms* and *Mrs. Melms* disclosed to them that Frey held the title to the brewery premises for her benefit. She was rightfully entitled to dower therein, and to a life estate in the homestead, which were included in the sale. She testified that she said, in their presence, that Frey would give the property back to her; that he had bid it off for $90,000. *Leopold Melms* testified that *Pabst* and Schandein were well informed about the matter. They had seen the attorney of the executors. His version of what took place was that he (*Melms*) explained to them that the property had been transferred to Frey, who held the title; that he was Frey's agent, and that she had a dower interest in the homestead — in the brewery; that she had paid interest on the incumbrances so

as not to lose her dower right in the brewery.  *Pabst* testified that he had no recollection of any such conversation with *Melms* or *Mrs. Melms.*

The terms of the agreement were not complied with until about two months after its date.  The deed to the purchasers, and their mortgage to *Leopold Melms* as trustee, were recorded December 30, 1870.  The purchasers, *Pabst* and Schandein, and the *Pabst Brewing Company* claiming under them, have been in the actual possession of the property ever since the 1st of November, 1870, claiming title thereto under the aforesaid conveyances, and under a lease thereof executed November 1, 1870, which was vacated by compliance with the terms of the agreement of sale, December 30, 1870.  The entire consideration of the sale to *Pabst* and Schandein, over and above the $65,000 stipulated to be paid on incumbrances by the vendees, was received by *Mrs. Melms.*  One of the executors, *Leopold Melms,* acted for her during the entire period of the administration, she not being familiar with business and not speaking the English language readily.  He was her banker during this period, and kept an account of all his receipts and disbursements, consisting entirely of money which was received from the estate of her husband, for allowances by statute, proceeds of certain sales of her dower interest in other real estate, and insurance on her husband's life and not a part of his estate, with $30,000 in bonds received on the sale of the brewery and homestead premises; but she had advanced considerable sums on the sale of the brewery premises, to reduce the incumbrances to $65,000, and had more than used up the entire proceeds of the life insurance policies.  He delivered to her, about April 15, 1871, an account in detail of all receipts and disbursements of her money, in which he gave her credit for having received on the sale of the brewery, "sold at $95,000, less mortgages, $65,000 — $30,000,"— and debited her, under date of May 25, 1870, with "Cost of brewery, $379.50;" showing

a balance in her favor of $26,578.43. She testified that she showed ·this account to her children, the plaintiffs, and that she believed that they had all seen it when they were at home, and wanted to see it more or less frequently; that it was in the house where they could see it; that some of them were not at home, but those at home saw it; that she thought they all saw it; and that she did not keep anything secret from her children,— though she subsequently materially qualified these statements. She said it was kept in a secretary in her house, and that she gave it, about ten years before the trial, to her son-in-law, Mr. Bechtel, husband of her daughter, *Elise Melms;* that she showed the account to the defendant *Pabst* in 1871, and he read the account over and did not say whether it was right or wrong or give her any satisfaction; that when she received the bonds and the account *Leopold Melms* was angry because she wanted them, and they had not been on good terms since.

The evidence shows that the estate of Charles T. Melms, at the time of his death and the transfers in question, was hopelessly insolvent; that the creditors, who had proved their claims to the amount of over $100,000, received only about twelve per cent. thereon, after applying all the proceeds of other property exclusive of that in dispute. While there is no satisfactory evidence, aside from its appraisal, showing what the brewery property was really worth, it is entirely clear that it could not have been sold for sufficient to have paid the claims of creditors, but that there would have been, beyond doubt, a large deficiency of assets.

At the time this action was commenced, the ages of the plaintiffs were as follows: *Franz Melms*, forty years; *Carl J.*, thirty-nine; *Johanna*, thirty-four; *Elise*, thirty-two; *Richard*, thirty-one; *Gustave J.*, twenty-eight; and *Hertha*, twenty-five. In May and June, 1881, they executed powers of attorney to the said Bechtel, who then resided at Milwaukee, authorizing him to take such steps as he might deem

necessary to secure any right or interest they or either of them had or might have in or to the real or personal estate of their deceased father, and to institute actions for the purpose of recovering and securing such interest, authorizing him, in making his investigations, to employ attorneys and, if he should consider it best, to settle and adjust, with or without litigation, any such interest with any person or persons who might have or hold the same, and to that end to execute and deliver deeds, acquittances, etc., and to receive and receipt for any money, property, or estate which might be recovered or obtained or paid in the premises. In 1881, *Leopold Melms* delivered a copy of the account which he had rendered to *Mrs. Melms*, with the checks and papers which he had relating to that subject, to said Bechtel, at the request of Mr. Goodwin, an attorney, of the firm of Goodwin & Benedict, who were the attorneys for the *Melms* heirs, and who instituted a suit for the recovery of some property sold by the executors, as well as the check for $379.50, which had written across its face, "Check to the account of *Marie Melms*," and had been given for the consideration named in the executors' deed to Frey. About this time he also wrote to the plaintiff *Carl J. Melms*, at New York, that he had grounds for a test case, and asked him to come to Milwaukee. It appears that Mr. Miller, who was connected with Goodwin & Benedict, after keeping these papers for a long time, delivered them to *Leopold Melms* October 1, 1890, about the time of the commencement of the present action. They embraced the original inventory of the estate and the Schandein and *Pabst* agreement, and he testified that he had made a pretty full examination of the Melms estate, going through all the papers in the probate court, looking up the record and conveyances, and conferred somewhat with *Leopold Melms* about it; that the interest of the heirs in the estate was put in his hands in 1881, and a suit against one Pfister for the recovery of some of the property sold was

commenced in June, 1882, and, after the determination of the suit, the papers had remained in his hands until he had so returned them.

After the conveyance to *Pabst* and Schandein, they and the brewing company made very considerable improvements on the premises, building thereon a bottling house, elevator, coal sheds, ice houses, cleansing room, etc., and seem to have operated the brewery continuously thereafter, and in the meantime the value of the property had very greatly increased.

William Melms, one of the executors, Frey, the grantee in the executors' deed, and Schandein died before the action was commenced.

The money thus received by *Mrs. Melms* from the sale of the brewery and her homestead right was used, to a very great extent, in maintaining herself and children, and in their education, and was the only resource she had for that purpose. The only explanation of the long delay of the plaintiffs in asserting their rights was " that until within a few months before the action they were all in entire ignorance of the character and record of the conveyances under which *Pabst* and Schandein and their grantee were in possession of the said premises, and of all the proceedings before the county court, and of the facts set out attending the administration and of said sales;" but they do not state how, or more definitely when, they made any discovery of fraud or improper conduct therein, nor is there anything on this subject in the evidence, save that an attempt was made to show, by *Leopold Melms*, that in September, 1890, he learned that, under the statute, a sale made either directly or indirectly to an executor or executrix, or for the benefit of such, was void; that he then consulted counsel, and notified the heirs, and the action was commenced; but the court excluded the evidence.

The court found, among other things, that *Pabst* and

Schandein were purchasers, *bona fide* and for a valuable consideration, of the premises, and entered into possession under and by virtue of the deeds executed to them immediately after the dates of the same, and that they and their grantees had so continued up to the commencement of the action; and held that the plaintiffs were not entitled to any relief, and gave judgment dismissing the complaint with costs, from which the plaintiffs appealed.

For the appellants there were briefs signed by *Francis Bloodgood*, of counsel, and *Bloodgood, Bloodgood & Kemper*, attorneys, and oral argument by *Francis Bloodgood*.

For the respondents there was a brief by *Winkler, Flanders, Smith, Bottum & Vilas*, and oral argument by *F. C. Winkler*.

The following opinion was filed March 10, 1896:

PINNEY, J.   1. The statute (R. S. sec. 3914) provides that, in sales of real estate made by an executor, administrator, or guardian, the executor, administrator, or guardian making such sale, or guardian of the heir of the deceased, " shall not directly or indirectly purchase, or be interested in the purchase of any part of the real estate so sold.   All sales made contrary to the provisions of this section shall be *void.*"   The sale to Jacob Frey, reported to the county court, of the premises in dispute, and the executors' deed of the same to him, and which were made for the use and benefit of the executrix, *Mrs. Melms*, she having paid the entire consideration, fall within the condemnation of this statute.   This sale was fraudulent in law, as against the creditors of the estate and the plaintiffs as heirs at law of Charles T. Melms, deceased.   The sale, in the first instance, was to Jacob Frey for $90,000; but he failed to make good his bid, and the sale was reported to the court as made for $379.50, and it was confirmed, and the executors' deed to him was executed accordingly.   Whether a deed made upon

a sale thus declared void is absolutely void or only *voidable*, and so would pass the legal title, and whether a *bona fide* purchaser for value, without notice, from the grantee in such a deed would take a valid title, is an important question and, in this state, a new one.

In *McCrubb v. Bray*, 36 Wis. 333, the question was suggested, but the court expressly declined to give any opinion in respect to it. In *Forbes v. Halsey*, 26 N. Y. 65, and *Terwilliger v. Brown*, 44 N. Y. 241, under a statute in the same terms, the objection was held fatal to the title as against innocent purchasers for value; but, in *Roulston v. Roulston*, 64 N. Y. 652, 654, it was said, in substance, that such a sale and purchase was valid as to all except those prejudiced by it, and as to them not void, but voidable. And *People v. Open Board of S. B. B. Co.* 92 N. Y. 98, is to the same effect. The question is whether the word *void* in the statute may not be fairly held, in the connection in which it is used, to mean *voidable*. Such a construction would seem to better accord with sound policy and the purposes of the statute than one which, for a secret defect, would defeat the title of an innocent purchaser for value; and in *White v. Iselin*, 26 Minn. 487, upon a statute in the same words, the word *void* was given only the force and effect of *voidable*, and this view is sustained in *Boyd v. Blankman*, 29 Cal. 19. The words *void* and *voidable* are not always used in statutes and reports with entire legal accuracy, and the word void is often construed as meaning only voidable. Endlich, Interp. Stat. § 270; *Allis v. Billings*, 6 Met. 415; *Jackson v. Henry*, 10 Johns. 185; *Dix v. Van Wyck*, 2 Hill, 522; *Green v. Kemp*, 13 Mass. 515; *Reading v. Weston*, 7 Conn. 409. If the statute should be so construed as to avoid sales by executors, administrators, and guardians on the ground stated, or for secret frauds, as against innocent purchasers for value, titles founded upon them would be so doubtful and uncertain that few would care to purchase or pay a fair price for

them. We think that the word *void* was used in the statute in the sense of *voidable*, and that the legal title to the premises passed to Frey by the executors' deed, subject to be questioned or impeached on the ground that his purchase was in trust for the use and benefit of *Mrs. Melms*, the executrix, and therefore fraudulent as against creditors of the estate whose claims had been proved, then remaining unsatisfied to the amount of not less than $100,000, and as against the plaintiffs as heirs at law.

2. The evidence is wholly insufficient to show that *Pabst* and Schandein, at the time they purchased the premises from *Mrs. Melms* and Frey, had notice, in fact, of the fraud and illegality which entered into the executors' sale and deed to the latter, or that they had notice, in fact, that the sale and executors' deed had been made to Frey for the use and benefit of *Mrs. Melms*, who was the real purchaser. *Mrs. Melms* was lawfully interested in this sale to the extent of her life estate in the homestead and her dower interest in the brewery property, and as to these subjects it was, in fact, for her benefit. The purchasers would naturally so understand it. *Leopold Melms* testifies that he explained to them that Frey held the title, and that he was Frey's agent; that she had a dower interest and homestead right, and had paid the interest on the incumbrances so as not to lose her dower right. But all this had no tendency to show that there was any objection existing to the title they were about to purchase. True, he adds that *Pabst* and Schandein "were well informed about the matter, and had seen the attorney of the executors;" but this is a matter of conclusion or inference on his part and gave no facts of any materiality or significance. It was probably a mere surmise on his part. The fact that *Mrs. Melms*, as she testifies, said in their presence that Frey would give the property back to her, and he had bid it off for $90,000, was not calculated to excite suspicion or lead them to doubt Frey's title. *Pabst* testifies that he

Melms and others vs. Pabst Brewing Co. and others.

does not remember any such conversations. Schandein, who was present, is dead, and the transaction took place more than twenty-three years before the trial. The actual payment of what was then considered a fair price is cogent evidence of good faith.

It is claimed that *Pabst* and Schandein had notice of the facts from an inspection by *Pabst* of the account rendered to *Mrs. Melms* by *Leopold Melms*, showing that she paid the consideration for the executors' deed, and received the proceeds of the sale after paying certain sums on the incumbrances; but the evidence leaves it extremely doubtful whether he examined the account with sufficient care to ascertain what it showed in these respects. A conclusive answer to this claim is that the account was not made up, nor was it shown to *Pabst*, until several months after the sale was completed and the rights of the parties had become fixed. It came too late.

The only other ground for imputing notice to the purchasers, requiring consideration, is that the attorney who had theretofore acted for the executors and executrix and Jacob Frey in making the executors' sale to Frey, reporting it to the court, and getting it confirmed, and in the preparation and execution of the executors' deed, and who was clearly cognizant of the illegality of the same, was chosen by *Pabst* and Schandein to act for them in the matter of the completion of the sale to them by *Mrs. Melms* and Frey, and to examine the title to the premises, with the understanding that he was to represent the latter in the same manner. Each party paid one half of his charges for such services. It is argued that the knowledge which such attorney had acquired of the illegality of the executors' sale and deed to Frey, while he had so acted for the executors and executrix and Frey, is to be imputed to *Pabst* and Schandein, and rendered them purchasers *mala fide.*

Notice to an agent or attorney is notice to his principal

or client in regard to the matter in which he is engaged; and where a purchaser employs the same attorney as the vendor, he will be affected with notice of whatever such attorney acquired notice of, in his capacity of attorney for either vendor or purchaser, *in the transaction* in which he was so employed. Notice to the attorney which will bind the client must be notice in the particular transaction in which the client has employed him. So, where one of two matters transacted by the same attorney, though the former was for another client, follows so soon after the other that it clearly appears that the earlier transaction cannot have been out of the mind of the attorney when engaged in the latter, there is no ground for restricting the notice to the client to the second transaction, but he will be affected with notice of both. The authorities bearing upon this proposition are considered in *Brothers v. Bank of Kaukauna*, 84 Wis. 395, where it was held that, if an agent acquires his knowledge of a prior transaction so recently as to make it incredible that he has forgotten it, his principal will be affected by it, although not acquired while transacting the business of his principal. In the case of *Constant v. University of Rochester*, 111 N. Y. 607, 611, the modification of the rule to the effect stated, as recognized in the case of *The Distilled Spirits*, 11 Wall. 356, was quite fully considered, and it was held that "the farthest that has been gone in the way of holding a principal chargeable with knowledge of facts communicated to his agent, where the notice was not received or the knowledge obtained in the very transaction in question, has been to hold the principal chargeable upon *clear proof* that the knowledge which the agent once had, and which he had obtained in another transaction and at another time and for another principal, was present to his mind at the very time of the transaction in question." *Slattery v. Schwannecke*, 118 N. Y. 547; *Constant v. University of Rochester*, 133 N. Y. 642.

There is very strong reason for holding, from the facts and circumstances of the case, that all the facts within the knowledge of the attorney, acting in the present instance for both parties, and acquired about five months before while acting as the attorney for the executors and the vendors, in respect to the illegality of the executors' deed, were present to his mind when acting for *Pabst* and Schandein, though there is no direct evidence on the subject; but the rule under consideration is subject to a most material qualification decisive of the present case. The rule itself is based upon the duty of the attorney or agent to disclose to his client or principal all knowledge and information he possessed at the time, in relation to the subject matter of the employment or agency, and the presumption is that he communicates it accordingly; but he cannot be expected to communicate what he has forgotten, or what it would be his legal duty to conceal, or information which, from his relation to the subject matter or his previous conduct, it is certain that he would not disclose. Whatever knowledge the mutual attorney had acquired in respect to the character and validity of the executors' deed and sale five months before was acquired under circumstances which would render it a breach of professional confidence to disclose it to another, or to take advantage of such knowledge to serve or promote the interests of another client; and therefore such second client would not be affected or bound by it. Wade, Notice, § 692; Mechem, Agency, §§ 721, 722. As was said by Mr. Justice BRADLEY in the case of *The Distilled Spirits*, 11 Wall. 367: "When it is not the agent's duty to communicate such knowledge, when it would be unlawful for him to do so, as, for example, when it has been acquired confidentially as attorney for a former client, the reason of the rule ceases, and in such case an agent would not be expected to do that which would involve the betrayal of professional confidence, and his principal ought not be bound by his agent's secret and

confidential information." *Hood v. Fahnestock,* 8 Watts,. 489; *Bracken v. Miller,* 4 Watts .& S. 111; *McCormick v. Wheeler, M. & Co.* 36 Ill. 116; *Innerarity v. Merchants' Nat. Bank,* 139 Mass. 333; *Allen v. S. B. R. Co.* 150 Mass. 205, 206; *Herrington v. McCollum,* 73 Ill. 476; *Ford v. French,*. 72 Mo. 250; *Martin v. Jackson,* 27 Pa. St. 504; *Cave v. Cave,* 15 Ch. Div. 639, 644. This limitation of the general rule was declared in *Kennedy v. Green,* 3 Mylne & K. 699;. and in *Waldy v. Gray,* L. R. 20 Eq. 252, BACON, V. C., said: "I take it to be very clearly established that if a person employed as a solicitor has done things which, if disclosed, would prevent the perfection of the security on which he is· engaged, which would show that a good title does not exist to that which he is the instrument of conveying to the purchaser, it is not to be expected or inferred that he would communicate what he has done to his client."

The whole doctrine of imputed notice to the client or principal rests upon the ground that the attorney or agent has knowledge of something, material to the particular transaction, which it is his *duty* to communicate to his principal. *Wyllie v. Pollen,* 3 De Gex, J. & S. 601. And notice of it will not be imputed to the client where it would be a breach· of professional confidence to make the communication; and where the interest in, or the relation of the attorney to, the previous transaction is such as would be, sufficient to induce· him to withhold the information, the presumption of its. communication is rebutted. The client will not be charged with notice of a fraud or wrong to which his attorney was a party while employed by another, and which it is quite· certain he would conceal. *Kettlewell v. Watson,* 21 Ch. Div. 707. The object of the executors' sale and deed to Frey for the use and benefit of *Mrs. Melms* was to secure to her the· brewery property or its proceeds as against the rights of creditors and heirs of her deceased husband, and the scheme· would have been utterly defeated if, upon the eve of suc-

Melms and others vs. Pabst Brewing Co. and others.

cess, the attorney for the vendors had disclosed the real nature of the transaction which he had conducted for the executors and such vendors. To impute to the purchasers, under such circumstances, notice of the real nature of that transaction, through the same attorney then acting for them as well as the vendors, would be gross injustice.

We hold, therefore, that *Pabst* and Schandein were *bona fide* purchasers for value, without notice of any fraud or illegality in the executors' sale, and that the claim of title of the plaintiffs cannot prevail.

3. We think that, under the facts and circumstances disclosed, the relief sought by the plaintiffs was properly denied for the reason that they had been guilty of laches in failing to investigate and bring forward their claims within a reasonable time. This property was subject at the time to incumbrances and to the claims of creditors, allowed against their father's estate, amounting in all, with accrued interest, to not less than $175,000, all of which would have to be paid before they could obtain any part of the estate. Their rights, therefore, as heirs, were technical rather than substantial, and they had no rational hope of realizing anything in due course of administration, because the estate was hopelessly insolvent. While, in contemplation of law, the executors' sale and deed to Frey for the use and benefit of their mother, executrix, etc., was fraudulent and voidable as to them, it is evident that the creditors were the parties intended to be, and who were really defrauded. The transaction, however, resulted indirectly for the benefit of the plaintiffs, as it was probably intended it should, in securing to their mother, out of the estate, the means to rear, support, and educate her children; and they have thus received from the estate benefits which could not have been secured to them by a legal and complete administration. Although, upon their technical legal title as heirs, they would have been entitled, within the authorities, to a resale

of the property at executors' sale, irrespective of the question whether it would have resulted in a price which would have secured to them any really substantial benefit, still these facts are entitled to consideration on the question of acquiescence and laches.

The plaintiffs knew that the large and valuable property in dispute, including the homestead, had been sold to *Pabst* and Schandein, and that they and their grantees had held, used, operated, and improved it to a considerable extent, paying taxes upon and claiming it as their own for a period of nearly twenty years before they brought their action. This, of itself, was notice to them, as heirs of their father's estate, to promptly investigate and ascertain, as soon as they were competent, what right, if any, they had or expected to assert to this property. The purchasers had paid $95,000 for the property, and the almost phenomenal growth and development of the city had largely increased its value. All the facts were known at the time to their mother, and between her and the plaintiffs the most intimate and affectionate relations existed and remained undisturbed, and the evidence shows that she had no secrets to keep from her children. Their uncle, *Leopold Melms*, knew all the facts, and had a feeling of friendship and interest in their welfare; and he seems to have been ready and willing to assist them in the recovery of the estate, ever since the question was mooted in 1881, when the powers of attorney were executed by the plaintiffs to Bechtel for that purpose. At that time a thorough investigation was had, which resulted in the production of documents which were sufficient to show the real character of their mother's title to the brewery property; certainly sufficient to induce inquiry, which could not have failed to disclose, beyond dispute, the real nature of the transaction. *Mrs. Melms* had in her possession her account with *Leopold Melms*, showing that she had bought the brewery property for $379.50, and that the entire con-

sideration received for it and the homestead and her dower right, after paying certain sums on incumbrances, was paid to her. It was set down in the account as "Profit realized on sale of brewery sold at $95,000, less mortgages $65,000,— $30,000." The plaintiffs testified that they did not see this account. It was where they might have seen it at any time, had they wished, though, in their great interest in the litigation, they may not have been able to remember the fact; but their mother did. It was never concealed from them. Their uncle, *Leopold Melms,* had a copy, which, with the checks and papers relating to it, were put into the hands of the attorneys acting under Bechtel, where they remained until almost the day when the action was commenced. All other facts appeared upon the records of the county court and register of deeds. In brief, the entire case could have been developed by a short and apparently obvious line of investigation. There was no concealment on the part of the purchasers. Indeed, it does not appear to have been understood that there was cause for any concealment. When the investigation was had under Bechtel, all the plaintiffs were of full age except two, aged nineteen and sixteen years, respectively; and when this action was commenced the youngest, who had lived continuously with her mother, was four years and three months past her majority, and an action at law for the recovery of her interest in the land would have been barred within nine months thereafter by R. S. sec. 3918. The plaintiffs appear to have been fairly well educated, and all testify that they were ignorant of the facts in the case until about the time the action was brought. Some of them testified at the trial that they did not know its real nature or the ground for it, although the action had been pending three years; that they supposed it was brought to get the property back for their mother. One of the sons, the oldest heir, had been absent on long voyages much of the time since his father's death.

Laches and neglect are always discountenanced in equity, which always refuses relief in favor of stale demands. Long delay, and even, sometimes, a delay of less than the period of limitation by statute, will be regarded as laches, and will prevent the intervention of equity; but laches will not be imputed to one while under disability, and there must have been knowledge, actual or imputable, of the facts, which should have prompted investigation and action; and, if there was actual ignorance, that must have been without just excuse. Beach, Mod. Eq. Jur. §§ 18, 19. This rule applies where the fraud is known or ought to have been known, where the facts and circumstances are such as to have made it the duty of a reasonably prudent person to investigate, and which, if pursued, would have led to a discovery. Pomeroy, Eq. Jur. § 917. The entire subject was fully considered in *Rogers v. Van Nortwick*, 87 Wis. 414, where a failure to act with reasonable diligence, upon knowledge of facts and circumstances which would have led to a discovery of the facts, was held to have amounted to laches such as would bar relief. The failure or delay to investigate must have been *blamable*, and what constitutes a reasonable time within which the action must be brought depends upon the facts and circumstances of each particular case; the court applying the rule of laches according to its own ideas of right and justice. *Wood v. Carpenter*, 101 U. S. 140, 141; *Brown v. Buena Vista Co.* 95 U. S. 157, 160; *Twin-Lick Oil Co. v. Marbury*, 91 U. S. 587.

It is said in *Hammond v. Hopkins*, 143 U. S. 224, 250: "No rule of law is better settled than that a court of equity will not aid a party whose application is destitute of conscience, good faith, and reasonable diligence, but will discourage stale demands, for the peace of society, by refusing to interfere where there have been gross laches in prosecuting rights, or where long acquiescence in the assertion of adverse rights has occurred. The rule is peculiarly applica-

Melms and others vs. Pabst Brewing Co. and others.

ble where the difficulty of doing entire justice arises through
the death of the principal participants in the transactions
complained of, or of the witness or witnesses, or by reason
of the original transactions having become so obscured by
time as to render the ascertainment of the exact facts im-
possible.  Each case must necessarily be governed by its own
circumstances, since, though the lapse of a few years may
be sufficient to defeat the action in one case, a longer period
may be held requisite in another, dependent upon the situ-
ation of the parties, the extent of their knowledge or means
of information, great changes in values, the want of probable
grounds for the imputation of intentional fraud, the destruc-
tion of specific testimony, the absence of any reasonable im-
pediment or hindrance to the assertion of the alleged rights,
and the like." *Halladay v. Land & R. I. Co.* 18 U. S. App.
308, 338, 57 Fed. Rep. 774; *Marsh v. Whitmore,* 21 Wall.
178; *Landsdale v. Smith,* 106 U. S. 391; *Norris v. Haggin,*
136 U. S. 386; *Mackall v. Casilear,* 137 U. S. 556; *Hanner
v. Moulton,* 138 U. S. 486.

Where the question of laches is in issue, the plaintiff is
chargeable with such knowledge as he might have obtained
upon inquiry, provided the facts already known by him were
such as to put a man of ordinary prudence upon inquiry.
*Kennedy v. Green,* 3 Mylne & K. 699, 722; *Erlanger v. New
Sombrero P. Co.* 3 App. Cas. 1231, 1280; *Carr v. Hilton,* 1
Curt. 390, 394; *Wood v. Carpenter,* 101 U. S. 141; *Johnston
v. Standard M. Co.* 148 U. S. 370.  Hence, the party in such
case must state in his bill, and prove at the hearing, "*the
time when* the fraud, mistake, concealment, or misrepresenta-
tion was discovered, *and what the discovery is,* so that the
court may clearly see whether, by the exercise of ordinary
diligence, the discovery might not have been made before."
*Stearns v. Page,* 7 How. 819, 829.  "Otherwise," as was held
in *Badger v. Badger,* 2 Wall. 87, 95, "the chancellor may
justly refuse to consider the case, on his own showing, with-

out inquiring whether there is a demurrer or formal plea of the statute of limitations contained in the answer." Tested by this rule, the complaint and case made by the plaintiffs are radically defective. There is no specific averment or proof of the discovery or time of discovery of any material fact.

The courts look with disfavor upon the claims of those who have failed to investigate and act upon sufficient cause, and have waited to decide, after large sums have been invested, when the danger is over that has been at the risk of others, to come in and claim the profit of the event; and so, too, where the delay has been great, and parties to or witnesses familiar with the transaction, as in this case, have died in the meantime. We think that the plaintiffs have been guilty of blamable delay. Knowledge of all the material facts was within their own family from the time of the purchase by *Pabst* and Schandein, and in 1881 we find, in the hands of the plaintiffs' attorneys, the account between *Leopold Melms*, one of the executors, and *Mrs. Melms*, who was executrix, which clearly disclosed facts which, when taken in connection with the record and the proceedings in the county court, made out their entire case. It matters not that their attorneys failed to discover what was really quite plain. The case falls within the principles stated, and we must hold that the plaintiffs have not shown reasonable diligence in investigating their rights and bringing them before the court.

For these reasons the judgment of the circuit court must be affirmed.

*By the Court.*— The judgment of the circuit court is affirmed.

A motion for a rehearing was denied May 1, 1896.