# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2017AP880-W |

| | |
|---|---|
| COMPLETE TITLE: | State of Wisconsin ex rel. Joshua M. Wren, Petitioner-Petitioner, v. Reed Richardson Warden, Respondent. |

REVIEW OF DECISION OF THE COURT OF APPEALS

| | |
|---|---|
| OPINION FILED: | December 26, 2019 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | September 6, 2019 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Milwaukee |
| JUDGE: | Carolina Stark |

JUSTICES:

HAGEDORN, J., delivered the majority opinion of the court, in which ROGGENSACK, C.J., ZIEGLER and KELLY, JJ., joined. BRADLEY, ANN WALSH, J., filed a dissenting opinion, in which BRADLEY, REBECCA GRASSL and DALLET, JJ., joined.

NOT PARTICIPATING:

ATTORNEYS:

For the petitioner-petitioner, there were briefs filed by *John T. Wasielewski* and *Wasielewski & Erickson,* Milwaukee. There was an oral argument by *John T. Wasielewki.*


For the respondent-respondent, there was a brief filed by *Sara Lynn Shaeffer,* assistant attorney general; with whom on the brief was *Joshua L. Kaul*, attorney general. There was an oral argument by *Sara Lynn Shaeffer.*

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2017AP880-W
(L.C. No. 2006CF2518)

STATE OF WISCONSIN : IN SUPREME COURT

**State of Wisconsin ex rel. Joshua M. Wren,**

    **Petitioner-Petitioner,**

    **v.**

**Reed Richardson Warden,**

    **Respondent.**

**FILED**

**DEC 26, 2019**

Sheila T. Reiff
Clerk of Supreme Court

HAGEDORN, J., delivered the majority opinion of the court, in which ROGGENSACK, C.J., and ZIEGLER and KELLY, JJ., joined. BRADLEY, ANN WALSH, J., filed a dissenting opinion, in which BRADLEY, REBECCA GRASSL and DALLET, JJ., joined.

REVIEW of a decision of the Court of Appeals. *Affirmed.*

¶1 BRIAN HAGEDORN, J. After his conviction in 2007 for reckless homicide, Joshua M. Wren alleges his counsel failed to file a notice of intent to pursue postconviction relief as promised, causing Wren to lose his direct appeal rights. Wren knew this, however, by sometime in 2010 or 2011. Over the next several years, Wren filed four pro se motions relating to his

conviction, none of which raised his counsel's alleged blunders. Then, in 2017, Wren filed a petition for a writ of habeas corpus asserting ineffective assistance of counsel for failing to appeal, and seeking to reinstate his direct appeal rights. In defense, the State pled laches, resting its case on the fact that the attorney who made the alleged missteps passed away in 2014, and no case files or notes remained. The court of appeals agreed with the State, imposed laches, and denied the petition.[1]

¶2 Before us, Wren asserts that our adoption of laches as an available defense to a habeas petition was ill-considered and should be reexamined. But even if laches can bar his claim, Wren maintains that the State failed to prove the elements, and that the court of appeals erroneously exercised its discretion in applying laches here.

¶3 We disagree. This court held just a few months ago that the State may assert laches as a defense to a habeas petition. See State ex rel. Lopez-Quintero v. Dittmann, 2019 WI 58, ¶10, 387 Wis. 2d 50, 928 N.W.2d 480. We decline to revisit that ruling today. On the merits, we agree with the court of appeals that the State established unreasonable delay and prejudice, the two laches elements Wren challenges. We further conclude that the court of appeals did not erroneously exercise its discretion by applying laches and barring relief.

---

[1] State ex rel. Wren v. Richardson, No. 2017AP880-W, unpublished slip op. (Wis. Ct. App. Nov. 12, 2018).

## I. BACKGROUND

¶4    In early 2006, 15-year-old Joshua Wren shot and killed a man.[2]  He pled guilty to first-degree reckless homicide, and in March 2007 was sentenced to 21 years of initial confinement and nine years of extended supervision——considerably more than Wren's counsel suggested and longer than was recommended in the presentence investigation report (PSI).[3]

¶5    On the day of sentencing, Wren's attorney, Nikola Kostich, filed the "Notice of Right to Seek Postconviction Relief"; this form contained a checked box indicating Wren was undecided about pursuing postconviction relief.  No notice of intent to seek postconviction relief was ever filed.

¶6    During the next ten years, Wren filed and litigated four pro se motions related to his conviction.

- In 2010, he unsuccessfully moved to vacate his DNA surcharge.  The circuit court denied his 2011 motion for reconsideration.

- In 2013, Wren again challenged the DNA surcharge and also sought to amend the judgment of conviction regarding his

---

[2] The State charged Wren with one count of first-degree reckless homicide.  The complaint alleged that, in an interview conducted by a Milwaukee police detective, Wren admitted he "took out a revolver from his left sweatshirt pocket and pointed the gun up in the air and fired a shot."  In the same interview, Wren stated that "he shot this man on accident."

[3] The PSI recommended 13 years of initial confinement and five to six years of extended supervision.  In exchange for Wren's guilty plea, the State agreed not to seek a specific sentence.

3

restitution obligations. The circuit court denied the DNA surcharge challenge once again, but did amend the judgment of conviction to clarify his restitution requirements.[4]

- In 2015, he sought a copy of the PSI. This motion was also denied, in part on the grounds that Wren previously had an opportunity to review the report and "the direct appeal deadline ha[d] long since expired."

- In 2016, Wren sought sentence modification, arguing that the circuit court relied on improper facts (an alleged beating by Wren of a fellow prisoner). The motion was denied as untimely filed.

¶7 Finally, in 2017, more than a decade after sentencing, Wren filed a Knight petition[5] in the court of appeals seeking to reinstate his direct appeal rights on the grounds of ineffective assistance of counsel. In Wren's telling, he and his family wanted to appeal and made multiple attempts to communicate this to Kostich. Yet they heard nothing back. The petition described Kostich's disciplinary history to substantiate his non-responsiveness.[6] The long and short of it, according to

---

[4] Specifically, the circuit court amended the judgment "to reflect that restitution shall be paid from up to 25% of the defendant's prison earnings (rather than funds)."

[5] "Habeas petitions to the court of appeals alleging ineffective assistance of appellate counsel are often referred to as 'Knight petitions.'" State ex rel. Kyles v. Pollard, 2014 WI 38, ¶27 n.11, 354 Wis. 2d 626, 847 N.W.2d 805; see also State v. Knight, 168 Wis. 2d 509, 484 N.W.2d 540 (1992).

[6] The petition notes that Wren's family discovered Kostich's "license to practice law in Wisconsin was suspended for 60 days in November 2012"; that he "was reprimanded in 1986 for a

4

Wren's petition, is that Kostich promised to appeal, did not do so, and never responded to multiple inquiries by Wren and his family. Wren insists he was left entirely without counsel in violation of his Sixth Amendment rights, and should therefore have his direct appeal rights reinstated.

¶8 The court of appeals remanded the matter to the circuit court for an evidentiary hearing. However, Kostich passed away in 2014, so the State had no witnesses, nor were any of Kostich's case files located. Nonetheless, the circuit court heard from Wren and three of his family members, and rendered factual findings based on the evidence presented.

¶9 Relevant circuit court findings include the following: Wren signed the Notice of Right to Seek Postconviction Relief six days before sentencing, he did not personally check the box indicating he was undecided about pursuing postconviction relief, and Wren was unaware which box would end up being checked. Wren contacted Kostich in a timely manner, and Kostich told Wren that he would appeal. Several of Wren's family members spoke with Kostich immediately after the original sentencing hearing, and Kostich told them an appeal would be forthcoming. After the deadline to appeal had passed, Wren wrote Kostich regarding the status of the appeal and never heard back. Wren's mother, father, and sister made similar efforts to

criminal conviction of failing to file tax returns"; and that "in 2010 he was reprimanded for representing a person on a criminal charge, in which he had previously consulted with the victim in the criminal case about potential civil action against the person ultimately represented in the criminal matter."

5

reach Kostich before and after the appeal deadline passed, all to no avail. Kostich "intentionally led" Wren and his family to believe he was going to timely file postconviction relief, but he failed to do so and notified no one. Kostich failed to contact Wren or his family after sentencing, despite their persistent efforts.

¶10 In accordance with Wren's testimony, the circuit court additionally found that sometime in 2010 or 2011, Wren knew no appeal had been filed. Though he sought relief of various kinds through four other pro se motions, Wren was unaware that he could petition to reinstate his direct appeal rights. He "wanted to seek postconviction relief regarding ineffective assistance of trial counsel and the sentence, but he did not know how to do so." Wren eventually learned what to do and how to do it after communicating with an incarcerated uncle, and he filed the present habeas petition within three to four months.

¶11 Following the evidentiary hearing, the court of appeals entertained briefing based on the circuit court's findings. The State did not challenge the facts found as clearly erroneous, nor did it address the merits of Wren's ineffective assistance of counsel argument because it could not; the State had no evidence or witnesses to present regarding what happened and why. Rather, it raised the defense of laches, essentially arguing that its hands were tied due to Wren's delay and his former counsel's intervening death. The court of appeals concluded that the State proved the requisite legal elements of laches, and exercising its own discretion,

6

determined it was equitable to apply laches in this case. We granted Wren's petition for review.

## II. DISCUSSION

¶12 Wren raises three arguments against the application of laches to his case.[7] First, he contends the doctrine of laches should not apply to habeas petitions at all. Second, he asserts the State failed to prove two of the three elements of laches——unreasonable delay and prejudice. Finally, Wren maintains the court of appeals erroneously exercised its discretion in choosing to apply laches to his petition.

### A. Laches Is a Defense to a Habeas Petition

¶13 Wren begins with a request that we reexamine our adoption of the laches defense to habeas petitions. His principal argument is that we incorporated laches into our habeas corpus jurisprudence somewhat thoughtlessly in two court of appeals opinions.[8] Whatever merit those criticisms may have,

---

[7] Wren also argues the merits of his habeas petition and asks us to reinstate his direct appeal rights. However, because we affirm the court of appeals' application of laches, we need not address this argument.

[8] Laches was first explicitly mentioned as a defense against a habeas petition in Wisconsin in 1986. State ex rel. McMillian v. Dickey, 132 Wis. 2d 266, 281, 392 N.W.2d 453 (Ct. App. 1986) ("While we recognize that a habeas proceeding may be dismissed under the equitable doctrine of laches, the delay on the part of the petitioner must be unreasonable."), abrogated on other grounds by State ex rel. Coleman v. McCaughtry, 2006 WI 49, 290 Wis. 2d 352, 714 N.W.2d 900. A later court of appeals decision cited McMillian for the proposition that "[a]s an equitable

however, we had occasion to directly answer this question last term. In Lopez-Quintero, we made clear that the State may raise laches as an affirmative defense to a habeas petition. 387 Wis. 2d 50, ¶16. Moreover, Wren did not raise and brief this issue below, nor was it presented in Wren's petition for review. Having just considered the matter, we decline Wren's invitation to reconsider it.

B. Laches Was Properly Applied to Wren's Habeas Petition

¶14 "Laches is founded on the notion that equity aids the vigilant, and not those who sleep on their rights to the detriment of the opposing party . . . ." 27A Am. Jur. 2d Equity § 108.[9] It is, at root, an equitable defense to an equitable claim.[10] Though different jurisdictions structure the analytical

_____

doctrine, habeas corpus is subject to the doctrine of laches." State ex rel. Smalley v. Morgan, 211 Wis. 2d 795, 800, 565 N.W.2d 805 (Ct. App. 1997), overruled on other grounds by State ex rel. Lopez-Quintero v. Dittmann, 2019 WI 58, 387 Wis. 2d 50, 928 N.W.2d 480.

Outside the context of habeas corpus, laches is a well-established equitable principle in Wisconsin jurisprudence. As early as 1859, this court stated that "[u]nreasonable delay, and mere lapse of time, independently of any statute of limitations, constitute a defense in a court of equity." Sheldon v. Rockwell, 9 Wis. 158 (*166), 162 (*181) (1859).

[9] See also Kenosha County v. Town of Paris, 148 Wis. 2d 175, 188, 434 N.W.2d 801 (Ct. App. 1988) ("equity aids the vigilant, not those who sleep on their rights").

[10] A habeas petition is an equitable claim, so application of an equitable defense like laches makes sense, especially where habeas petitions can be filed years after the conviction. See State ex rel. Dowe v. Circuit Court for Waukesha Cty., 184 Wis. 2d 724, 728-29, 516 N.W.2d 714 (1994) ("As an equitable

8

framework somewhat differently, the doctrine is consistent in concept: did a party delay without good reason in asserting its rights, and did the delay prejudice the party seeking to defend that claim.

¶15 In Wisconsin, application of laches to habeas petitions proceeds in two steps. First, the party asserting the defense——the State in this instance——must prove the following three elements: "(1) unreasonable delay in filing the habeas petition, (2) lack of knowledge on the part of the State that the petitioner would be asserting the habeas claim, and (3) prejudice to the State." Lopez-Quintero, 387 Wis. 2d 50, ¶16. Second, even if the State proves all three elements, the court may——in its discretion——choose not to apply laches if it determines that application of the defense is not appropriate and equitable. See State ex rel. Washington v. State, 2012 WI App 74, ¶26, 343 Wis. 2d 434, 819 N.W.2d 305.

¶16 Whether the State proved all three elements under step one is a legal question we review de novo. State ex rel. Coleman v. McCaughtry, 2006 WI 49, ¶17, 290 Wis. 2d 352, 714 N.W.2d 900. Assuming step one is satisfied, we review the decision to apply laches under step two for an erroneous exercise of discretion. Id.

---

doctrine . . . habeas corpus is confined to situations in which there is a pressing need for relief or where the process or judgment upon which a prisoner is held is void.").

9

¶17 Wren asserts that the State failed to prove two of the three elements——unreasonable delay and prejudice.[11] And even if the State did meet its burden, Wren maintains the court of appeals erroneously chose to apply laches in his case.

### 1. The State Proved Unreasonable Delay

¶18 Whether a delay is reasonable is case specific; we look at the totality of circumstances. State ex rel. McMillian v. Dickey, 132 Wis. 2d 266, 281, 392 N.W.2d 453 (Ct. App. 1986) ("What is reasonable varies from case to case and involves the totality of the circumstances."), abrogated on other grounds by Coleman, 290 Wis. 2d 352; see also 27A Am. Jur. 2d Equity § 131 ("Whether a party's delay is unreasonable depends on the circumstances of the particular case.").

¶19 In rendering its conclusion, the court of appeals zeroed in on two factual findings. First, Wren was aware no appeal had been filed by 2010 or 2011. And during the intervening time period, he filed four separate pro se motions, none of which raised the issue presented in this habeas petition. The court of appeals held that the six-year delay from the time he knew no appeal had been filed——a full ten years after the deadline to seek postconviction relief——was unreasonably long.

---

[11] Wren concedes the second element, i.e., the State lacked knowledge that he would be asserting the habeas claim.

¶20 As an initial matter, unreasonable delay in laches is based not on what litigants know, but what they might have known with the exercise of reasonable diligence. This underlying constructive knowledge requirement arises from the general rule that "ignorance of one's legal rights is not a reasonable excuse in a laches case." 27A Am. Jur. 2d Equity § 138.[12] "Where the question of laches is in issue, the plaintiff is chargeable with such knowledge as he might have obtained upon inquiry, provided the facts already known by him were such as to put a man of ordinary prudence upon inquiry." Melms v. Pabst Brewing Co., 93 Wis. 153, 174, 66 N.W. 518 (1896) (citations omitted). To be sure, what we expect will vary from case to case and litigant to litigant. But the expectation of reasonable diligence is firm nonetheless.[13]

¶21 Thus, the question is when Wren either knew or should have known he had a potential claim. We agree with the court of appeals that the delay clock started running no later than 2010 or 2011 when Wren, by his own admission, learned no appeal had been filed and had long since heard nothing from his attorney.

---

[12] See also Jones v. United States, 6 Cl. Ct. 531, 533 (1984) ("Where laches is raised, knowledge of the law is imputed to all plaintiffs. Consequently, professed ignorance of one's legal rights does not justify delay in filing suit.").

[13] See also 27A Am. Jur. 2d Equity § 139 ("The correct inquiry in determining whether a claimant's conduct resulted in a want of due diligence requires focus not upon what the plaintiff knows, but what he or she might have known, by the use of the means of information within his or her reach, as the law requires a party to discover those facts that were discoverable through the exercise of reasonable diligence.").

11

After obtaining this knowledge, Wren researched and leveraged his available resources to craft four separate pro se motions relating to his conviction and sentence——none even hinting at the claims raised before us.[14] After four attempts to seek various kinds of other postconviction relief, we agree with the court of appeals that a habeas petition coming ten years after his conviction and six years after he knew his attorney didn't file the appeal he was allegedly promised is a delay without good reason.

¶22 Wren raises two principal objections in response. First, he didn't know he could make such a claim and didn't know how to do so; and when he did discover this possible claim, he timely brought it within three to four months. Second, Wren proffers that any delay is actually the State's fault, and that's why he was supposed to have counsel in the first place.

¶23 Wren's first objection, echoed by the dissent, is really an effort to except Wren from the constructive knowledge requirement we apply to all other litigants. The not-so-silent argument being made is that Wren is less capable than others and should be held to a lower standard. However, we regularly

---

[14] His first two motions dealt with the DNA surcharge and restitution award. It was not until his third motion in 2015 that he turned his attention to his sentence, the issue he states he would like to challenge if his direct appeal rights are reinstated. But even his 2016 motion for sentence modification was based on the circuit court's purported reliance on an improper fact——again, nothing suggesting a broader challenge to his conviction or sentence, or to his trial counsel's effectiveness.

12

require legally untrained litigants to assert their rights in a timely manner.[15] Nothing prevented Wren from contacting another attorney. Nothing prevented Wren from researching available options to ensure he took advantage of every possible legal argument he could make. It surely cannot be that 20-year-olds (Wren's approximate age when he found out no appeal was forthcoming) are deemed incompetent. And while the PSI noted Wren had a second grade reading level at the time of sentencing, that detail alone does not mean he cannot research, consult others, and find out what needs to be done. In fact, Wren did just this when he filed four pro se motions regarding other matters prior to filing his habeas petition. This reflects someone who is more than capable of being resourceful.[16]

¶24 Wren's paramount objection seems to be that as a pro se litigant whose postconviction attorney abandoned him, any delay is the State's fault, not his. Incorrect. As we explain

---

[15] See infra, ¶25. Courts have long recognized that a violation of constitutional rights——and ineffective assistance of counsel is a violation of the Sixth Amendment——must be timely asserted even in criminal cases. See Yakus v. United States, 321 U.S. 414, 444 (1944) ("No procedural principle is more familiar to this Court than that a constitutional right may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it.").

[16] For example, Wren noted in his habeas petition that his family discovered Kostich's disciplinary history. Moreover, the circuit court made no findings suggesting that Wren had the kind of severe mental limitations that might call for even broader latitude than we normally give pro se litigants.

13

below, we have long required pro se litigants, just like those with an attorney, to act reasonably in defense of their rights.

¶25 Pro se litigants are generally granted "a degree of leeway" in recognition of the fact that they are ordinarily unfamiliar with the procedural rules and substantive law that might govern their appeal. Rutherford v. LIRC, 2008 WI App 66, ¶27, 309 Wis. 2d 498, 752 N.W.2d 897. But by definition, "a degree of leeway" means the additional leniency will run out at some point. Thus, for example, while we construe pro se petitions, motions, and briefs to make the most intelligible argument we can discern, we do not impute to pro se litigants the best argument they could have, but did not, make.[17] And while pro se litigants are given leeway in the style of a motion, we ordinarily hold them to strict deadlines, whether they know about them or not.[18] In other words, we generally do not hold pro se litigants only to deadlines or arguments that

---

[17] See State v. Romero-Georgana, 2014 WI 83, ¶69, 360 Wis. 2d 522, 849 N.W.2d 668 ("Although we liberally construe filings by pro se litigants, . . . there is a limit to our lenience. A reviewing court might avert its eyes from the flaws on the peripheries, but it will not ignore obvious insufficiencies at the center of a motion." (internal citation omitted)).

[18] See Waushara County v. Graf, 166 Wis. 2d 442, 452, 480 N.W.2d 16 (1992) ("Pro se appellants must satisfy all procedural requirements, unless those requirements are waived by the court. They are bound by the same rules that apply to attorneys on appeal. The right to self-representation is '[not] a license not to comply with relevant rules of procedural and substantive law.'" (quoting Farretta v. California, 422 U.S. 806, 834 n.46 (1975))).

14

they know; we hold them to deadlines and arguments we expect them to discover with reasonable diligence. This means that once Wren no longer had a lawyer representing him, he was not free to do nothing to address the claims he raised in his habeas petition. Rather, he had an independent obligation to act——the same standard we apply to all pro se litigants.

¶26 The postconviction relief process is instructive on this point. Following a direct appeal, defendants seeking to attack their criminal convictions may do so through a motion under Wis. Stat. § 974.06 (2017-18).[19] But this form of relief comes with a significant restriction. Under subsection (4), unless a "sufficient reason" is given, any legal issues that could have been raised in a prior motion may not be brought in a subsequent § 974.06 motion. § 974.06(4). And in 1994, this court made clear that if the issue could have been raised on direct appeal, the litigant has lost the opportunity to bring it under § 974.06. State v. Escalona-Naranjo, 185 Wis. 2d 168, 173, 517 N.W.2d 157 (1994).[20]

---

[19] All subsequent references to the Wisconsin Statutes are to the 2017-18 version.

[20] This is no outlier; State v. Escalona-Naranjo has been cited thousands of times in Wisconsin courts. 185 Wis. 2d 168, 517 N.W.2d 157 (1994).

¶27 The vast majority of motions under Wis. Stat. § 974.06 are filed by pro se litigants.[21] The statute's strictures are not ignored or relaxed for pro se litigants; we apply the same rules to everyone. This means that even a potentially meritorious constitutional claim on a petitioner's third § 974.06 motion——a claim for ineffective assistance of counsel, for example——is a nonstarter if it could have been brought on direct appeal or in the prior § 974.06 motions.[22] These pro se litigants, no less than Wren here, are almost uniformly untrained in the law. Yet we expect them to exercise reasonable diligence to learn all potentially meritorious claims and to raise them in their first § 974.06 motion. If they don't, the claim is procedurally barred, whatever its merits may be.[23]

---

[21] This is in large part because there is no constitutional right to counsel on a collateral attack. Pennsylvania v. Finley, 481 U.S. 551, 555 (1987) ("We have never held that prisoners have a constitutional right to counsel when mounting collateral attacks upon their convictions, . . . and we decline to so hold today. Our cases establish that the right to appointed counsel extends to the first appeal of right, and no further." (internal citation omitted)).

[22] See, e.g., Escalona-Naranjo, 185 Wis. 2d at 186 ("[Escalona-Naranjo] has not alleged a sufficient reason as to why his allegation of ineffective assistance of trial counsel could not have been raised when he filed his [Wis. Stat. §] 974.02 motion for a new trial."); Romero-Georgana, 360 Wis. 2d 522, ¶5 ("[T]he defendant has not offered a sufficient reason in his third postconviction motion for failing to raise his [Wis. Stat.] § 974.06 claim [for ineffective assistance of counsel] in his second postconviction motion. . . . Consequently, the defendant's claim is barred.").

[23] Unless, of course, an exception in Wis. Stat. § 974.06 is triggered.

16

¶28 Wren appears to believe——as does the dissent——that ineffective assistance of counsel is an exception to these principles. Yet no authority to this effect is cited, nor are we aware of any. Without question, if Wren told Kostich to file an appeal and Kostich failed to do so, that failure would establish constitutionally deficient performance, and prejudice is presumed. See Garza v. Idaho, 139 S. Ct. 738, 744 (2019) ("[P]rejudice is presumed 'when counsel's constitutionally deficient performance deprives a defendant of an appeal that he otherwise would have taken.'" (quoting Roe v. Flores-Ortega, 528 U.S. 470, 484 (2000))). The law is clear that Wren is not liable for the faults of his constitutionally deficient counsel. See Coleman v. Thompson, 501 U.S. 722, 754 (1991).

¶29 But Wren and the dissent take this proposition far afield from its more modest foundations. They argue that when a defendant alleges he has been denied his Sixth Amendment right to effective assistance of counsel, any subsequent delay must be attributed to the State due to its failure to provide adequate counsel in the first instance. Or said another way, if his counsel failed, Wren is relieved of any further obligation to assert his own rights. Or maybe more charitably, because he didn't know what actions to take, Wren was absolved from taking any action at all.[24] There are two problems with this line of argument.

---

[24] Wren also argues he did not know he should file a habeas petition in the court of appeals until our 2014 decision in Kyles, 354 Wis. 2d 626. But this decision only clarified where such a claim should be filed. Nothing in Kyles announced

17

¶30 First, it assumes Wren's Sixth Amendment right to counsel was denied. But that is the very claim Wren wishes to maintain if this habeas petition is successful. One cannot assume his ultimate claim will be successful in order to assess whether he delayed in bringing that very claim.

¶31 Second, and more to the point, Wren's argument that laches cannot apply when counsel fails to appeal as promised is without any legal support in Wisconsin. The issue before us is not, did Wren, with counsel, miss the deadline. The question is, knowing counsel did not file an appeal, did Wren himself unreasonably delay in seeking relief. If the dissent is correct that any delay of the sort alleged here is attributable to the State, then Wren could wait ten, twenty, or even thirty years to raise his claim, regardless of any impact on the State's ability to address the merits of an alleged ineffective assistance claim. This cannot be correct. Pro se litigants, including those who claim their trial counsel did not serve them by filing an appeal, still have an independent obligation to timely raise these issues with the court on their own. A pro se litigant has no license to "lay in the weeds and wait to raise an issue of

anything new related to the substance or timing of a petition to reinstate direct appeal rights because of ineffective assistance of trial counsel. The issue here is not that Wren timely raised the claim in the wrong court. It is that he untimely raised the claim.

This argument is also unpersuasive in light of the fact that, notwithstanding his filing of several postconviction motions in the interim, Wren did not file his habeas petition until three years after Kyles was decided.

potential merit." Washington, 343 Wis. 2d 434, ¶23. After knowing no appeal had been filed, and after knowing his counsel had not responded to him, Wren had an obligation to exercise reasonable diligence and raise the issues in a timely manner. Wren's delay of six to seven years from the time he knew this is not attributable to the State; it is on Wren. Put simply, Wren had some time to figure this out, but not unlimited time. Here, his delay was unreasonable.

### 2. The State Proved Prejudice

¶32 Wren's unreasonable delay alone is not sufficient to support the application of laches. The State also must prove that the unreasonable delay prejudiced its defense against the habeas petition.[25] Coleman, 290 Wis. 2d 352, ¶19. "What amounts

---

[25] Many jurisdictions include in their prejudice analysis whether the delay prejudices the state's ability to address the underlying merits should the petition be granted. The State has made no such argument in this case, but it is a common position around the country. See, e.g., United States v. Darnell, 716 F.2d 479, 480 (7th Cir. 1983) ("The government's ability to meet successfully the allegations of the motion or to present a case against the defendant if he is granted a new trial may be greatly diminished by the passage of time." (footnote omitted)); Telink, Inc. v. United States, 24 F.3d 42, 48 (9th Cir. 1994) ("In making a determination of prejudice, the effect of the delay on both the government's ability to respond to the petition and the government's ability to mount a retrial are relevant." (citing Darnell, 716 F.2d at 480)); In re Douglas, 200 Cal. App. 4th 236, 246 (Cal. Ct. App. 2011) ("[T]he People have been prejudiced both with regard to retrying Defendant and to responding to issues raised in Defendant's petition."); Armstrong v. State, 747 N.E.2d 1119, 1120 (Ind. 2001) ("For post-conviction laches purposes, prejudice exists when the unreasonable delay operates to materially diminish a reasonable likelihood of successful re-prosecution." (citation omitted));

to prejudice, such as will bar the right to assert a claim after the passage of time pursuant to laches, depends upon the facts and circumstances of each case, but it is generally held to be anything that places the party in a less favorable position." 27A Am. Jur. 2d Equity § 143.

¶33 Courts commonly describe two types of prejudice: evidentiary and economic.[26] The State here claims evidentiary

---

Woodberry v. State, 101 P.3d 727, 731 (Kan. Ct. App. 2004) ("The length of th[e] delay is unreasonable, and the State would undoubtedly be prejudiced if forced to retry [the petitioner]."); Jones v. State, 126 A.3d 1162, 1182 (Md. 2015) ("[W]e conclude that, for purposes of determining whether laches bars an individual's ability to seek coram nobis relief, prejudice involves not only the State's ability to defend against the coram nobis petition, but also the State's ability to reprosecute."); Johnson v. State, 714 N.W.2d 832, 838 (N.D. 2006) ("[P]rejudice exists when the unreasonable delay operates to materially diminish a reasonable likelihood of successful re-prosecution." (quoting Kirby v. State, 822 N.E.2d 1097, 1100 (Ind. Ct. App. 2005))); Ex Parte Perez, 398 S.W.3d 206, 215 (Tex. Crim. App. 2013) ("[We] expand the definition of prejudice under the existing laches doctrine to permit consideration of anything that places the State in a less favorable position, including prejudice to the State's ability to retry a defendant . . . .").

[26] See ABB Robotics, Inc. v. GMFanuc Robotics Corp., 828 F. Supp. 1386, 1393 (E.D. Wis. 1993) ("Material Prejudice 'may be either economic or evidentiary.'" (quoted source omitted)). American Jurisprudence, using slightly different terms, describes it this way:

> Generally, there are two main types of prejudice arising from delay by plaintiffs in bringing their claims that support the laches defense: (1) "defense prejudice," whereby the defendant is impaired from successfully defending itself from suit given the passage of time; and (2) "economic prejudice," whereby the costs to the defendant have significantly increased due to the delay.

prejudice. "Evidentiary prejudice . . . may arise where a plaintiff's delay in bringing an action has curtailed the defendant's ability to present a full and fair defense on the merits due to the loss of evidence, the death of a witness, or the unreliability of memories." 30A C.J.S. Equity § 158.

¶34 The loss of key records and the unavailability of essential witnesses are "classic elements" of prejudice in a laches defense. Id. The death of key witnesses is precisely the kind of thing laches is aimed at, particularly where the "the decedent's knowledge is crucial to a party's defense . . . ." 27A Am. Jur. 2d Equity § 152. American Jurisprudence explains:

> The doctrine of laches is peculiarly applicable where the difficulty of doing justice arises through the death of the principal participants in transactions complained of, or of witnesses to transactions . . . . For example, documents may have been misplaced or destroyed, or it may be difficult or impossible for the party to defend a claim if essential witnesses are deceased . . . .

Id. § 149.[27]

---

27A Am. Jur. 2d Equity § 144.

[27] The Wisconsin Practice Series offers draft forms for practitioners. One of its sample laches forms addresses precisely this type of scenario as an archetypal issue. The form reads:

> The plaintiff had knowledge of all of the facts set forth in the complaint at least _____ years before commencement of this action. During that interval, all persons who would be material witnesses have died, the defendant's position has substantially changed as a result, and the defendant is materially prejudiced. The plaintiff should be barred by laches from obtaining relief in this action.

¶35 Wren asserts that the State has not proven prejudice. He rests his argument largely on the fact that the State's claim of prejudice relies on the unavailability of Attorney Kostich. And in that vein, Wren points specifically to the circuit court's factual findings that he believed Kostich would file an appeal on his behalf and subsequently failed to respond to Wren or his family, despite their attempts to contact him. If these findings are accepted, Wren maintains, that establishes ineffective assistance of counsel, and no contradictory hypothetical evidence could matter.

¶36 Wren's argument on this point is superficially strong, but it rests on a faulty foundation. To be sure, the State does not contest the circuit court's factual findings. But fairly understood, the State advanced something even more fundamental: it had no tools and no evidence to defend the habeas claim at all because its necessary evidence——the files and testimony of Kostich——were unavailable due to Wren's unreasonable delay in raising the issue. The State made this point most poignantly at oral argument when it said it did not challenge the factual findings because——due to Wren's delay——it had nothing with which to challenge them. Even the evidentiary hearing at which the circuit court made its factual findings was a one-sided story. This is the very definition of prejudice.

---

5 Wisconsin Practice Series: Civil Procedure Forms § 40:433 (3d ed. 2019).

¶37 It is no excuse to say that we do not know what testimony Kostich would have offered, or what evidence his case files may have contained. <u>Zizzo v. Lakeside Steel & Manufacturing Co.</u> is instructive on this point. 2008 WI App 69, 312 Wis. 2d 463, 752 N.W.2d 889. There, a son who inherited property sought to discharge the mortgage obligations on the property in part on the grounds of laches. <u>Id.</u>, ¶1. His deceased parents received a loan in 1989 and were supposed to pay off the property in 1993, but no payments were ever made, nor were efforts made to collect or foreclose on the mortgage. <u>Id.</u> The mortgage holder responded that no prejudice was shown, essentially arguing the claim was "speculative because he does not know exactly what information his [deceased] parents possessed . . . ." <u>Id.</u>, ¶20. The court's response there is true here as well: "<u>Of course</u> he does not know that information——and that is exactly how he is prejudiced." <u>Id.</u>

¶38 It is important to stress that prejudice to a party for purposes of laches does not mean a party is so disadvantaged that it cannot prosecute its case. The prerequisite under our law is prejudice due to the delay, i.e., disadvantage to a party. Thus, the legal element is met by showing the State's defense of the habeas petition was meaningfully disadvantaged. The death of the essential witness to the events at issue, along with the loss of his documentary files, unquestionably satisfies this standard.

### 3. The Court of Appeals Appropriately Exercised Its Discretion in Applying Laches

¶39 Though we agree that the State proved all three elements of laches as a matter of law, the court of appeals still had the duty and authority to decide whether to apply laches in this case. As noted above, we review this decision for an erroneous exercise of discretion. Coleman, 290 Wis. 2d 352, ¶17. Therefore, as long as the court applied a proper standard of law and employed a demonstrated, rational process to reach a conclusion that a reasonable court could reach, the decision should be affirmed. State v. Cooper, 2019 WI 73, ¶13, 387 Wis. 2d 439, 929 N.W.2d 192. When we review a discretionary decision, we look for reasons to affirm the lower court's decision, even if its reasoning could have been explained more fully. See State v. Hurley, 2015 WI 35, ¶29, 361 Wis. 2d 529, 861 N.W.2d 174.

¶40 The court of appeals properly acknowledged it needed to exercise its discretion whether to apply laches to Wren's case. In deciding to do so, the court reasoned that application was appropriate because "Wren waited over ten years to raise concerns about the lack of appointment of postconviction counsel and a direct appeal, despite the fact that he sought relief numerous times from the trial court." State ex rel. Wren v. Richardson, No. 2017AP880-W, unpublished slip op. at 9 (Wis. Ct. App. Nov. 12, 2018). The court relied significantly on the reasoning of Washington, 343 Wis. 2d 434, where the petitioner waited five years to seek reinstatement of his appellate rights.

24

¶41 Wren's objections to the court's decision to apply laches are predominantly echoes of his previous arguments: he shouldn't be faulted for the State's failure to ensure he had constitutionally adequate counsel; he didn't know he could do this; and he wasn't familiar with the court system.

¶42 All of these assertions, however, are aimed at a rebalancing of the equities in this court. That is not how we review discretionary decisions. The court of appeals' decision is sufficient to satisfy our standard of review. It was reasonable for the court to conclude that even if the State failed to provide him with constitutionally adequate counsel, any subsequent delays by Wren should not be attributed to the State.[28] It was reasonable to conclude that the State's

---

[28] Furthermore, while failure to file an appeal is deficient performance for which prejudice is presumed, claims of ineffective assistance of counsel generally fail absent some form of corroboration of the attorney's actions.

A defendant on a post-conviction motion may bring a claim of ineffective counsel. If the counsel in question cannot appear to explain or rebut the defendant's contentions because of death . . . then the defendant should not, by uncorroborated allegations, be allowed to make a case for ineffectiveness. The defendant must support his allegations with corroborating evidence. Such evidence could be letters from the attorney to the client, transcripts of statements made by the attorney or any other tangible evidence which would show the attorney's ineffective representation. . . . In other words, we will presume that counsel had a reasonable basis for his actions, and the defendant cannot by his own words rebut this presumption. Such a burden will assure that post-conviction proceedings will not be brought solely on the basis of ineffective counsel

25

inability to mount a defense due to Wren's delay should outweigh Wren's interest in further challenging his conviction.[29] The question before us is not whether we would have made the same decision, but whether the court of appeals applied a proper standard of law and employed a demonstrated, rational process to reach a conclusion that a reasonable court could reach.[30] The answer is yes it did.

### III. CONCLUSION

¶43 We decline Wren's invitation to reconsider our decisions holding that laches is an available defense to a habeas petition. The State raised the defense in response to Wren's petition and proved all three elements of laches, in particular, unreasonable delay and prejudice. We also affirm the court of appeals' exercise of discretion in applying laches

---

when counsel dies or for some other reason becomes unavailable to explain his or her prior actions.

State v. Lukasik, 115 Wis. 2d 134, 140, 340 N.W.2d 62 (Ct. App. 1983).

[29] The dissent would balance the equities differently, giving more weight to the prejudice to Wren. Dissent, ¶75. That is the very definition of rebalancing the scales in violation of our standard of review.

[30] See Burkes v. Hales, 165 Wis. 2d 585, 590, 478 N.W.2d 37 (Ct. App. 1991) ("And where the record shows that the court looked to and considered the facts of the case and reasoned its way to a conclusion that is (a) one a reasonable judge could reach and (b) consistent with applicable law, we will affirm the decision even if it is not one with which we ourselves would agree." (footnote omitted)).

to Wren's petition.  Therefore, we affirm the court of appeals' denial of Wren's petition for a writ of habeas corpus.

*By the Court.*—The decision of the court of appeals is affirmed.

¶44 ANN WALSH BRADLEY, J. *(dissenting)*. "It is incongruous to state that a defendant was denied the right to counsel and then preclude the defendant from raising a claim because of errors made due to the absence of counsel." State ex rel. Kyles v. Pollard, 2014 WI 38, ¶56, 354 Wis. 2d 626, 847 N.W.2d 805. Yet the majority opinion does just that.

¶45 In doing so, the majority endorses a significant failure in our system of justice. Abandoned by counsel and hampered by a second grade reading level, Wren was left to fend for himself. Not surprisingly, he spent several years adrift in a sea of pro se motions. Once he learned that the correct mechanism to seek reinstatement of the appeal rights he had lost due to his counsel's abandonment was to file a habeas petition, he did so promptly.

¶46 I agree with the majority that laches is a defense available to the State in response to a petition for habeas corpus. See majority op., ¶3. Our case law is well established on this point. See, e.g., State ex rel. Lopez-Quintero v. Dittman, 2019 WI 58, ¶10, 387 Wis. 2d 50, 928 N.W.2d 480.

¶47 However, I part ways with the majority's application of the doctrine of laches to the facts of this case. In my view, the majority errs in its determination that Wren's delay was unreasonable. The majority further errs in refusing to disturb the court of appeals' conclusion that the application of laches in this case was equitable.

1

¶48 Because I determine that Wren's delay was not unreasonable, and the application of laches to bar his claim is hardly equitable, I respectfully dissent.

I

¶49 At the age of 15, Wren was charged with first-degree reckless homicide. The next year, in 2007, he pleaded guilty as charged in exchange for the State's agreement not to seek a specific sentence. As the majority acknowledges, the sentence he received was "considerably more than Wren's counsel suggested and longer than was recommended in the presentence investigation report (PSI)." Majority op., ¶4.

¶50 Wren told his attorney, Nikola Kostich, that he disagreed with the sentence.[1] Attorney Kostich responded that Wren should not worry because they would appeal. Immediately after the sentencing hearing, members of Wren's family also spoke with Attorney Kostich, and Attorney Kostich also assured them that he would file an appeal on Wren's behalf.

¶51 Such an appeal never came. Wren and members of his family attempted to contact Attorney Kostich over a period of

---

[1] The facts as set forth in this dissent are largely taken from the circuit court's findings of fact. The State has not challenged these facts as clearly erroneous. Majority op., ¶11.

2

several years, but they received no response.[2]  Accordingly, the circuit court found as a fact that "Attorney Kostich intentionally led Wren and third parties acting on his behalf to believe that he would timely complete the requirements necessary for the defendant to seek postconviction relief, and then he failed to do so without notifying Wren or third parties acting on his behalf."  Attorney Kostich passed away in 2014.

¶52  The circuit court additionally found as a fact that "[s]ometime in 2010 or 2011, Wren concluded that Attorney Kostich had not filed an appeal on his behalf.  After reaching this conclusion, Wren still wanted to seek postconviction relief regarding ineffective assistance of trial counsel and the sentence, but he did not know how to do so."  Consistent with such an intent, Wren filed various motions in the circuit court from 2010 to 2016.  Id., ¶6.  However, Wren did not know that he could file a habeas petition that could reinstate his appeal rights.

---

[2] Attorney Kostich was brought before this court for professional discipline on four prior occasions, including during the relevant period here.  See In re Disciplinary Proceedings Against Kostich (Kostich IV), 2012 WI 118, 344 Wis. 2d 534, 824 N.W.2d 799; In re Disciplinary Proceedings Against Kostich (Kostich III), 2010 WI 136, 330 Wis. 2d 378, 793 N.W.2d 494; In re Disciplinary Proceedings Against Kostich (Kostich II), 2005 WI 90, 282 Wis. 2d 206, 700 N.W.2d 763; Matter of Disciplinary Proceedings Against Kostich (Kostich I), 132 Wis. 2d 227, 391 N.W.2d 208 (1986).  In two of these instances, Attorney Kostich was disciplined for failing to communicate with a client or a client's family member or failing to act with reasonable diligence as are the allegations in this case.  Kostich IV, 344 Wis. 2d 534; Kostich II, 282 Wis. 2d 206.

¶53 Wren testified that he eventually learned of the mechanism of a habeas petition from his uncle, who was incarcerated in another institution. He further testified that within "three to four months" of learning this information, he filed the petition for writ of habeas corpus that is the subject of this case, seeking to reinstate his right to pursue the postconviction relief he thought he would be seeking through Attorney Kostich. Specifically, Wren argued that he was denied the right to a direct appeal and the right to the assistance of counsel on that appeal, because he was abandoned by his attorney.

II

A

¶54 The majority's first error lies in its determination that Wren's delay in seeking to reinstate his appeal rights was unreasonable.

¶55 In the majority's view, "the delay clock started running no later than 2010 or 2011 when Wren, by his own admission, learned no appeal had been filed . . . ." Id., ¶21. After he learned no appeal had been filed, the majority reasons, "Wren researched and leveraged his available resources to craft four separate pro se motions relating to his conviction——none even hinting at the claims raised before us." Id.

¶56 While the majority places the delay at Wren's feet, it glosses over the underlying reason that an appeal was never filed——that Wren was abandoned by his counsel and thus completely denied the right to counsel on direct appeal in

4

violation of the Sixth Amendment. See State ex rel. Seibert v. Macht, 2001 WI 67, ¶10, 244 Wis. 2d 378, 627 N.W.2d 881 (recognizing a constitutional right to counsel on appeal); Page v. Frank, 343 F.3d 901, 909 (7th Cir. 2003) ("It is well established that a criminal defendant possesses the right to effective assistance of counsel through his first appeal of right."); Evitts v. Lucey, 469 U.S. 387, 396 (1985).

¶57 Indeed, such abandonment by counsel has been described by the Seventh Circuit as a "per se violation of the sixth amendment." Castellanos v. United States, 26 F.3d 717, 718 (7th Cir. 1994). "If the defendant told his lawyer to appeal, and the lawyer dropped the ball, then the defendant has been deprived, not of effective assistance of counsel, but of any assistance of counsel on appeal." Id.

¶58 United States Supreme Court precedent dictates that, as a constitutional matter, the responsibility for the denial of counsel on direct appeal is imputed to the State. And it is the State which must bear the cost——dare I say the burden——of the resulting default. In Coleman v. Thompson, 501 U.S. 722, 754 (1991), the Court wrote:

> Where a petitioner defaults a claim as a result of the denial of the right to effective assistance of counsel, the State, which is responsible for the denial as a constitutional matter, must bear the cost of any resulting default and the harm to state interests that federal habeas review entails.

In other words, "if the procedural default is the result of ineffective assistance of counsel, the Sixth Amendment itself requires that responsibility for the default be imputed to the

5

State."    Id. (quoting Murray v. Carrier, 477 U.S. 478, 488 (1986)).

¶59 These principles certainly apply here.  It is the State's responsibility to provide Wren with counsel, and it utterly failed in that endeavor.   To say that Wren "unreasonably" delayed when the delay must be imputed to the State turns Supreme Court precedent on its head.

¶60 Nevertheless, the majority seems unfazed by the Sixth Amendment mandate that the responsibility for the delay be imputed to the State.  According to the majority it is the pro se defendant, with a second grade reading ability who was abandoned by counsel, that we hold responsible instead.

¶61 The majority admonishes that:  "Nothing prevented Wren from contacting another attorney.  Nothing prevented Wren from researching available options to ensure he took advantage of every possible legal argument he could make."   Majority op., ¶23.   Really?   First of all, such statements have no record support.  But more importantly, is this really the high bar that we are requiring of pro se litigants like Wren——"to take advantage of every possible legal argument he could make?"

¶62 It is the rare member of the public who even knows of the existence of a writ of habeas corpus, let alone what it means and how and when to file such a writ.  Recall that even experienced lawyers and courts were unsure how to proceed.  This court did not clarify the proper forum for filing a habeas petition until 2014,[3] but the majority curiously expects a non-

---

[3] See State ex rel. Kyles v. Pollard, 2014 WI 38, ¶3, 354 Wis. 2d 626, 847 N.W.2d 805.

6

lawyer abandoned by counsel to have figured it all out before then.

¶63 Further, the majority wrongly holds Wren's filings prior to this habeas proceeding against him. It relies on the assertion that "Wren researched and leveraged his available resources to craft four separate pro se motions relating to his conviction——none even hinting at the claims raised before us" to support the proposition that Wren sat on his rights. Id., ¶21.

¶64 But Wren is not trained in the law, and he was a mere 15 years old at the time of his crime. The record indicates that he read at a second grade level. He was completely abandoned by counsel and left to fend for himself through no fault of his own.

¶65 The majority asserts that it is simply holding Wren to "the same standard we apply to all pro se litigants." Id., ¶25. Citing to secondary sources, the majority declares that Wren's ignorance of his legal rights does not absolve him of any obligation. Id., ¶20. It cites general maxims regarding pro se litigants, but its platitudes fail to address a defendant who has been denied his constitutional right to direct appeal due to the complete desertion of his counsel. See id., ¶25.

¶66 Indeed, the majority conflates a willing pro se litigant with a criminal defendant blamelessly abandoned by counsel.[4] If the justice system worked as it should have, Wren

_____

[4] The majority further conflates the denial of the right to counsel on direct appeal with a postconviction motion where the defendant already had the benefit of a direct appeal with the assistance of counsel. See majority op., ¶27.

7

would not have been pro se in the first place. He was not pro se by choice, but was forced into an untenable position by his counsel's complete abandonment.[5]

¶67 In the majority's view, "once Wren no longer had a lawyer representing him, he was not free to do nothing to address the claims he raised in his habeas petition." Id., ¶25. However, Wren did not "do nothing." He did what he could with the resources and knowledge he had.[6] The fact that Wren filed other pro se motions on unrelated issues with the assistance of other inmates indicates that Wren remained engaged in his case, not that he had abandoned his quest to reinstate his appeal rights.

¶68 Once Wren learned about petitions for a writ of habeas corpus, he filed one straight away. Indeed, he testified that he filed his habeas petition "three to four months" after learning that such a petition was an option available to him. Contrary to the suggestion of the majority, these facts do not paint a picture of a litigant "lay[ing] in the weeds and

---

[5] The United States Supreme Court has "long held that a lawyer who disregards specific instructions from the defendant to file a notice of appeal acts in a manner that is professionally unreasonable." Roe v. Flores-Ortega, 528 U.S. 470, 477 (2000) (citations omitted). "This is so because a defendant who instructs counsel to initiate an appeal reasonably relies upon counsel to file the necessary notice." Id.

[6] See Kyles, 354 Wis. 2d 626, ¶57 (rejecting the State's argument that Kyles' prior unsuccessful pro se attempts to seek relief that "were thwarted due to his lack of legal knowledge and the lower courts' confusion over where and how he should file his claims" barred a subsequent petition for habeas corpus).

8

wait[ing] to raise an issue of potential merit." See State ex rel. Washington v. State, 2012 WI App 74, ¶23, 343 Wis. 2d 434, 819 N.W.2d 305; Betts v. Litscher, 241 F.3d 594, 596 (7th Cir. 2001) ("The Constitution does not permit a state to ensnare an unrepresented defendant in his own errors and thus foreclose access to counsel.").

¶69 I therefore conclude that Wren's delay was not unreasonable. Wren acted promptly upon learning the correct mechanism for seeking to reinstate his appeal rights and, in any event, as a constitutional matter, such a delay is properly imputed to the State in the first instance.[7]

B

¶70 The majority also errs in upholding the court of appeals' determination that the equities favor the State. Cautioning against "rebalancing . . . the equities in this court[,]" the majority concludes that the court of appeals "applied a proper standard of law and employed a demonstrated, rational process to reach a conclusion that a reasonable court could reach." Majority op., ¶42.

¶71 As a starting point, I do not dispute that the State is prejudiced by the delay that resulted from Attorney Kostich's

---

[7] The majority posits that this dissent stands for a rule that "Wren could wait ten, twenty, or even thirty years to raise his claim, regardless of any impact on the State's ability to address the merits of an alleged ineffective assistance claim." Majority op., ¶31. Nonsense. Contrary to this suggestion, this dissent addresses only the facts before us, and does not speculate as to what the result would have been if Wren had waited a longer period of time before filing his habeas petition.

9

abandonment of his client. If an attorney's lack of recollection of events coupled with the destruction of the attorney's files is enough to establish prejudice to the State, then the unavailability of an attorney for testimony due to the attorney's death must also be sufficient. See Washington, 343 Wis. 2d 434, ¶25.

¶72 However, the analysis cannot end there. Even if all elements of laches are proven, a court still must determine, in its discretion, whether to apply laches and deny the petition. Id., ¶20. Laches is, after all, an equitable defense. Sawyer v. Midelfort, 227 Wis. 2d 124, 159, 595 N.W.2d 423 (1999).

¶73 In my view, the court of appeals erroneously exercised its discretion by giving short shrift to the competing prejudice suffered by Wren. Although it is true that the State suffers prejudice by not being able to question Kostich, the State is not the only party prejudiced by Kostich's absence. See Garza v. Idaho, 139 S. Ct. 738, 744 (2019) (explaining that prejudice is presumed when a defendant is "left entirely without the assistance of counsel on appeal" or "when counsel's constitutionally deficient performance deprives a defendant of an appeal that he otherwise would have taken") (citations and internal quotations omitted). Certainly Wren would have liked to have Kostich on the stand just as much, if not more, than the State.

¶74 Given the record indicating a complete lack of response from Attorney Kostich to Wren or his family members, Wren would have likely benefited from having Attorney Kostich on

10

the stand to confirm that the attorney did nothing to pursue Wren's appeal. Indeed, the circuit court found as a fact that "Attorney Kostich intentionally led Wren and third parties acting on his behalf to believe that he would timely complete the requirements necessary for the defendant to seek postconviction relief, and then he failed to do so without notifying Wren or third parties acting on his behalf." If Kostich's testimony would confirm the finding that Wren asked Attorney Kostich to file an appeal and he simply didn't do it, then Wren is prejudiced to a far greater extent than is the State.

¶75 Giving proper weight to the prejudice to Wren, the equities clearly favor Wren and militate against the application of laches.[8] Further, it was the State that denied Wren counsel on appeal, and it would be inequitable to now hold Wren accountable for the State's failing. I therefore conclude that the court of appeals erroneously exercised its discretion because it did not give the competing prejudice suffered by Wren the weight it is due.

¶76 For the foregoing reasons, I respectfully dissent.

¶77 I am authorized to state that Justices REBECCA GRASSL BRADLEY and REBECCA FRANK DALLET join this dissent.

---

[8] In the majority's estimation, this conclusion represents an impermissible "rebalancing" of the equities. Majority op., ¶42 n.29. Rather than "rebalancing" the scale, this dissent seeks to make sure that all considerations are properly on the scale in the first place.

11